Kennett LOVE, Plaintiff,

v.

Jonathan KWITNY, Congdon & Weed, Inc., St. Martin's Press, Inc., Book-of-the-Month Club, Inc., Barnes & Noble Bookstores, Inc., B. Dalton Company, Coliseum Books, Inc., Doubleday Doran Book Shops, Inc., and John Kelly, Defendants.

No. 84 Civ. 9289 (MBM).

United States District Court,
S.D. New York.

Feb. 21, 1989.

Stefan Bauer–Mengelberg, New York City, for plaintiff.

John C. Lankenau, Robert D. Balin Lankenau Kovner & Bickford, New York City, for defendants.

## OPINION AND ORDER

MUKASEY, District Judge.

The facts underlying this copyright infringement action developed over more than thirty years, beginning with a journalist's involvement as observer and, slightly, as participant, in the August 1953 overthrow of the Iranian government headed by Prime Minister Mohammed Mossadegh. The dispute centers on an unpublished manuscript by that journalist, plaintiff Kennett Love, written in 1960. The manuscript describes events surrounding the overthrow and the restoration to power of the Pahlevi monarchy in the person of the Shah—in particular, facts suggesting strongly that this country's Central Intelligence Agency had a hand in the coup, and also that Love himself may have played a role in speeding the outcome of the battle that broke resistance in front of Mossadegh's house at the climax of the coup.

More than half of that unpublished manuscript was quoted verbatim in defendant Jonathan Kwitny's 1984 book, *Endless Enemies*, published and distributed by the remaining defendants.[1] Kwitny claims, and Love denies, that he had Love's consent to publish to the extent he did, and that in any event publication here was a fair use of Love's account within the meaning of the copyright statute. The case was tried to the court without a jury. Because I have found, after considering all the evidence and weighing the credibility of the witnesses, that Kwitny did not have Love's consent to use the work to the extent he did, and that the fair use doctrine does not protect the unauthorized publication here at issue, judgment will be entered for plaintiff as to liability. The parties agreed that the issue of damages would be tried separately, if necessary.

### I.

In August 1953 plaintiff Kennett Love was the New York Times correspondent in Teheran who witnessed and reported on the overthrow of the Mossadegh government. In the spring of 1960, while studying at Princeton University, Love wrote a course paper entitled "The American Role in the Pahlevi Restoration" which, as its name suggests, treats several incidents Love saw at the time of the overthrow that reflected this country's involvement—through the

---

1. The action has been discontinued with prejudice as to defendants Coliseum Books, Inc., Doubleday Doran Book Shops, Inc. and John Kelly. The action against defendant Congdon & Weed, Inc. has been stayed by order of the Bankruptcy Court.

activities of the CIA—in the August 1953 events.

In particular, Love describes being taken just before the climax of the coup by an American political attache, to whom he refers as a CIA man, to the home of another embassy official where he met Ardeshir Zahedi, the son of General Fazlollah Zahedi. The general would replace Dr. Mossadegh as part of the Pahlevi restoration. He saw there also a large copying machine that was being used to duplicate a royal decree or *firman* proclaiming General Zahedi to be prime minister, and took several copies to his hotel where he left them on the front desk. In the paper, Love recounts also the tactics employed by street gangs allegedly organized by another CIA agent and paid so handsomely in U.S. currency as to depress the dollar on Teheran currency markets for days after the coup.[2] Further, Love describes his own responsibility, "in an impromptu sort of way, for speeding the final victory of the royalists." This arose from his having encountered about a half dozen royalist tanks sitting idle at the radio station, where he had gone to broadcast a dispatch. He told their commanders of the battle then underway in front of Mossadegh's house, which was defended by three tanks, and suggested they join the fray. Love reports that they followed his suggestion, and turned the battle in favor of the royalist side. (Px 5A, p. 39)

These incidents, except for an unexplained drop in the dollar on Teheran currency markets, were not reported in the stories that appeared under Love's by-line in the New York Times.

In July 1966, while interviewing Allen W. Dulles, then former director of the CIA, in connection with a book on the 1956 Suez crisis, Love mentioned his 1960 paper. Dulles expressed his interest, and within the week Love sent him a copy. Dulles apparently placed Love's paper in his files.

When the retired CIA director died in 1969, he left those files, including Love's paper, to Princeton University, where they were housed in the Seeley Mudd Manuscript Library. That library permits access to the Dulles papers only upon agreement that any article based on those papers be cleared in advance, and copies onto each page of those papers duplicated for a researcher the following notice:

"The U.S. Copyright Law (Title 17j[17], U.S.Code) governs the making of photocopies of copyrighted material. The person making use of this photocopy is liable for any infringement of the Copyright Law. Manuscripts copied from THE ALLEN DULLES PAPERS in the Princeton University Library are not to be reproduced or published without the permission of the Library."

Love testified that he took particular care to assure that any use made of his work, including the unpublished Princeton paper, was accurate in his view and that he would generally review any such proposed use as the price of granting his permission. In the spring and summer of 1980 Professor Barry Rubin of Georgetown University sought and received Love's permission to cite the paper in limited fashion in his book, *supra* at n. 2, but only after Love had reviewed and edited the proposed segments, including Rubin's bibliographic citation to Love's paper. Love made it a point to assure that the citation did not create the impression Love had written the paper for Dulles or the CIA. (Px 11) He testified also to having taken particular care before giving permission to quote his paper in two other works. (Tr. 354)

In his concern about being connected with the CIA, Love seems to have been prescient. In September 1980 the magazine CounterSpy, which prides itself, if that is the term, on exposing CIA agents, heralded its monthly issue with a press conference to announce an article purporting to

2. In this respect Love's account differs from another that purports to describe CIA involvement in the coup: "The CIA provided $1 million in Iranian currency, which [Kermit] Roosevelt had stored in a large safe—a bulky cache since the largest banknotes then available—the 500-rial denomination—were worth only $7.50. Of this sum, $100,000 was given to the two Iranian agents to disburse among the athletic club thugs and the poor of the south Tehran slums." B. Rubin, *Paved With Good Intentions: The American Experience and Iran* 82 (1981).

expose Love as a CIA agent, based on the 1960 paper. The magazine also quoted large segments of the paper, without Love's authorization. Apparently, CounterSpy editor John Kelly had obtained a copy of the paper without complying with the restrictions imposed by the library. Love denied then and still does that he acted as such an operative. CounterSpy's purported revelation and denials by both Love and Times personnel received brief press attention. In one of those stories, which appeared in The New York Times on September 26, 1980, Love was quoted as having attributed to "misguided patriotism" his failure to report on the American involvement in the coup, although the article suggested his knowledge of such involvement did not come until later in 1953.[3]

In the summer of 1981, Jonathan Kwitny, then a Wall Street Journal reporter and by then the author of four books, began work on *Endless Enemies* under contract to Congdon & Weed; he continued to work on it, doing "relatively little" else, until it was published in 1984. The thesis of the book is that U.S. policy around the world, and occasionally at home, is often guided by misperceptions of where this country's real interests lie and who and what are the real dangers that confront it. As Kwitny would have it, these misperceptions are frequently induced by multinational corporations, particularly oil companies, and people they have hired or otherwise influenced. He argues that the press fails to correct and in fact reinforces these misperceptions. Kwitny attributes to the policy makers and journalists he faults a world view in which this country is beset continually by what the author believes are imaginary threats— *i.e.*, paranoid visions of "endless enemies."

Kwitny had read Rubin's book and obtained from Kelly of CounterSpy a copy of the Love manuscript purloined from the Princeton library. The manuscript suited Kwitny well, reflecting as it did both this country's involvement in what he argues was a counterproductive battle against an imaginary threat, and the press' failure to report that involvement. He set about trying to reach Love, following a lead provided by a New York Times story about the CounterSpy article in 1980 which reported that Love had a house in East Hampton. According to Kwitny, he tried repeatedly to reach Love at the East Hampton number he received from the telephone company. Kwitny testified that he got no answer until, to his surprise, Love picked up the receiver at about 9:30 on the morning of February 21, 1983, the date of the Washington's Birthday holiday that year. Kwitny testified that he had called so often without receiving an answer that when he finally reached Love he had not prepared himself with a blank piece of paper on which to take notes. He seized a page from his own manuscript and took notes on the back. Kwitny testified that he was then aware of his wish to quote "substantially" from Love's manuscript and so informed Love, who gave his consent to such quotation. (Tr. 177, 199) Kwitny said at trial that he had been conscious of a potential libel problem if he did not convey accurately what Love had written in the manuscript, apparently in that Kwitny would deal harshly with Love for failing to include in his New York Times stories the account of U.S. (and his own) involvement in the 1953 events in Teheran, and that he had to quote extensively from Love's paper in order to give readers the "full flavor" and to offer a talisman of his own good

---

**3.** Love insisted at trial that, notwithstanding the contents of his 1960 paper, he was unaware in August 1953 of CIA involvement in the coup. He conceded that in 1954 he had written to Times foreign editor Emanuel Freedman explaining that he had omitted from his Times dispatches evidence of U.S. involvement in Iran because such evidence would have been "too good grist for the Russian propaganda mill." (Tr. 125) At trial, however, he claimed he had simply been trying in such correspondence to

provoke his editor into making him pursue the story. He testified that the Times had shown itself uninterested in any reports that might have disclosed covert U.S. activities, and insisted that whatever "misguided patriotism" there had been in not reporting fully on events in Iran had been that of his colleague in the Middle East Robert Doty and "the entire top level of The New York Times, beginning with Manny Freedman and up." (Tr. 156)

faith to potentially disbelieving readers. (Tr. 170–71)

The notes include Love's East Hampton post office box number, an item of information not available in any public listing, and reflect that during the conversation Love said he had "never tried to publish" the manuscript, and that he "[m]ay use it in a book but haven't gotten around to it." The notes, insofar as they deal with the subject of Love's authorization to Kwitny to use his paper, read in their entirety as follows: "Told I may quote—With credit. 'Fine.' Several times say I intend to quote some of this." (Dx B) The word "substantially," or a term of similar import, appears nowhere in the notes.

Love denied vehemently at trial not only that he had ever given authorization to Kwitny to quote "substantially" from his 1960 manuscript, but that the conversation had taken place at all. Although he had conceded on earlier occasions that Kwitny might have called him, by the time of trial his recollection had hardened into an oft-reiterated certainty that, "There was no phone conversation." (Tr. 339; see also, Tr. 65, 338, 340, 341, 344) In support of his denial, Love testified elaborately to alleged circumstances that would have him living in another house at the time, in the nearby town of Sagaponack, rather than in his East Hampton house where the pipes had frozen. He recounted in some detail why he could recall making certain calendar notes that day in Sagaponack rather than in East Hampton. The details of this denial might be relevant were it not for a single and dispositive piece of evidence as to whether the conversation took place. Kwitny's telephone bill, secured directly from the telephone company, reflects a 15-minute call on the morning in question to Love's East Hampton number. The powerful force of this evidence is enhanced by the presence of Love's post office box number in Kwitny's notes, information that could not have come from any source demonstrably available to Kwitny other than Love himself. Because it defies belief that Kwitny spent 15 minutes in conversation

with a workman on the premises or in the mute grasp of a malfunctioning answering machine,[4] and that he sought to enhance the credibility of fabricated notes by obtaining Love's post office box number from some undisclosed source while neglecting to include in such notes evidence to support his claim that Love authorized "substantial" quotation from the paper, it is apparent that, notwithstanding Love's denials, there was a phone conversation. The contents of that conversation, however, can be determined only after considering other evidence.

Chapter Ten of Kwitny's book, entitled "Upsetting the Balance: Iran and Afghanistan," develops the thesis that the CIA, at the behest of Rockefeller and other oil interests, staged a coup in August 1953 to overthrow Mossadegh, a mere eccentric nationalist and Anglophobe mistaken for a Soviet pawn, and bring to power a violently repressive monarchy. This sowed the seeds of anti-Americanism among the Iranians, and led a quarter century later to the ghastly harvest of the Khomeini regime with resulting denial of Iranian oil to U.S. markets, and local weakness that paved the way for the Soviet invasion of Afghanistan, a process that went unreported in the United States. Of the 26 pages given over to developing this thesis, about half are devoted to lengthy quotations from Love's manuscript, cited as support for the thesis.

Here it bears mention that insofar as Kwitny appears to argue that the U.S. role in overthrowing Mossadegh and restoring the Shah's power incurred the enmity of the Iranians, his view and Love's as expressed in the 1960 paper are consistent, as the following segment, quoted by Kwitny, makes plain:

"What is significant is that Americans restored the Pahlevi monarchy when it threatened to give way before a premier dependent on communist support and that Iranians are well aware of the American role although the American public is not. Thus it is that many Iranians hold the United States responsible for creating and supporting a regime

4. Love apparently intended to pursue this theory at trial, but then waived it. (Tr. 335–37)

that they believe has become an increasingly malign influence on the political, social and economic life of the country." (Px 5A, p. 41, quoted in *Endless Enemies* at 176–77. As therein quoted, the last sentence is italicized.)

Kwitny quoted not only Love's description of events and incidents relating immediately to the August 1953 coup, but also Love's analysis of the underlying political and social conditions in Iran—that country's dispute with the Anglo–Iranian Oil Company; Mossadegh's views and goals; the strengths and strategy of Tudeh, the Iranian communist party—as well as Love's version of U.S. policy toward Iran and his speculation about Soviet intentions in that part of the world.

More than 50 percent of the words in Love's paper are quoted in Chapter Ten of Kwitny's book, interrupted intermittently by pauses to provide facts that do not appear in Love's text, to insert arch and sometimes humorous asides of which many deride Love,[5] and, occasionally, to summarize rather than quote Love's account. Kwitny italicizes Love's text repeatedly to emphasize portions that he believes support his thesis.

Although Kwitny and Love appear to hold at least congruent if not identical views about the 1953 events in Iran and their consequences, Kwitny presents Love as at best an unwitting tool of the CIA, if not an actual agency hireling, and as a traitor to his profession for failing to report what he knew and did. Thus, before his lengthy quotation from Love's paper, Kwitny describes it as having been "submitted" to Dulles (as opposed to having been sent at his request about six years after it was first written), reports Love's denial "that he was ever actually employed by the CIA" (Kwitny at p. 160), and adds that he can "pretty well accept the *Time*'s word that it wasn't paying him on behalf of the CIA." (*Id.*) He then concludes that Love "later explained, rather lamely perhaps, that he acted as he did because of 'misguided patriotism,'" (Kwitny at 160–61), a reference either to his own conversation with Love or to the September 26, 1980 New York Times article following the CounterSpy imbroglio.[6] Of Love's sugges-

5. For example, after quoting Love's description of his cordial reception at a large and disciplined Tudeh rally and the organizers' willingness to give him a grandstand view, Kwitny interjects that "maybe they wouldn't have [accommodated Love] if they had known he was getting ready to take an active, covert part in a CIA coup." Kwitny at p. 170. Love refers to two people who operated the copying machine to duplicate copies of the firman at the home of the unidentified U.S. attache, of whom Kwitny writes: "[Apparently these were U.S. government employees; our Iranian stooges couldn't even churn out their own propaganda.]" Kwitny at p. 172.

6. Kwitny does not discuss how Love's failure to report what he saw and did in Teheran, and his newspaper's decision not to pursue the story, if there was such a decision, compared to journalistic practice at the time—*i.e.*, 1953, as distinct from 1984, when Kwitny published his book. There is substantial evidence for the proposition that it was once accepted for journalists not to print information they believed disserved the national interest. Thus, for example, Thomas P. ("Tip") O'Neill, the former Speaker of the House of Representatives, reports that in 1934 he pursued the invitation of his Boston acquaintance Missy LeHand, President Roosevelt's secretary, to visit the White House when he was in Washington, and was shown into the President's of-

fice where he was "shocked" to see Roosevelt in a wheel chair. "Like most Americans, I had absolutely no idea that Franklin Roosevelt was disabled. It's hard to imagine in this age of television, but in those days the president's handicap was kept secret out of respect for the office." T. O'Neill & W. Novak, *Man of the House* 3 (1987). Such journalistic self-censorship is referred to in a section headed "Another Era" in F. Friendly & M. Elliott, *The Constitution: That Delicate Balance* 54–55 (1984). Perhaps the most famous example of the practice, and the one generally conceded to have ended it, was the decision by the editors of The New York Times in 1961 not to report on the then imminent Bay of Pigs invasion. *See* T. Szulc, "*The New York Times* and the Bay of Pigs" in D. Brown & W.R. Bruner, eds., *How I Got That Story* 315–29 (1967). A year later, the editors of the Times agreed to withhold for 24 hours at President Kennedy's request news of the developing Cuban missile crisis, but only after the President promised, in the words of Times editor Max Frankel, to "shed no blood and start no war during the period of our silence." Frankel, *A Washington Education*, The Columbia Forum 10 (Winter 1973). "No such bargain was ever struck again, though many officials made overtures. The essential ingredient was trust, and that was lost somewhere between Dallas and Tonkin." *Id.*

tion to the royalist commanders at the radio station that their tanks might be useful at an engagement then in progress at Mossadegh's residence, and their later defeat of the armor protecting that residence, Kwitny wrote as follows:

"And there we have it, folks—the Iranian correspondent for the *New York Times* directing the successful tank attack on the home of the Iranian prime minister, overthrowing the government, fixing one-man rule in Iran, and setting off a chain of events that would include the loss of Iranian oil to U.S. markets and the invasion of Afghanistan by the Soviet Union." (Kwitny, at 176)

As the publication date for *Endless Enemies* neared, the book was reviewed by counsel, who apparently recommended that Kwitny memorialize or confirm that he had received Love's permission to quote as extensively as he did. Describing his conversations with counsel, Kwitny testified, "I remember she [counsel] said that there is a substantial amount [of Love's paper], there is a lot of it [quoted in Kwitny's book], so we ought to have something in writing." (Tr. 267) Kwitny did the initial draft of the letter, which was then reviewed and approved by counsel. The letter was dated February 8, 1984 and was addressed to Love at his East Hampton post office box, the address that appears on Kwitny's notes of his February 21, 1983 telephone conversation with Love. By the time the letter was sent, the book was in galleys and Kwitny's editor had already expressed his intention to publish by May "by means of a very fast crash schedule (with a premium paid for fast typesetting)." (Px 50) The full text of the letter, which Kwitny argues confirms a conversation about a year earlier in which he received Love's approval to use "substantial" portions of the 1960 paper, is as follows:

"Since nearly a year has passed since our phone conversation last February 21, I wanted to touch base, first to repeat my respect for your work as the most vivid and detailed account I have found of the events in Iran in 1953 and to thank you again for your cooperation in helping make this knowledge public, and second,

to make sure there hasn't been some change either in your personal status or in your knowledge of Iranian events that should be accounted for in my book.

"Although these old events in Iran are only a small portion of the book I've done, which is global in scope, they make an interesting interlude largely because of the kind of detail your 1960 account has helped provide. I want to assure you again that the passages I have selected to use are clearly marked off as quotes and credited to you in the text. I only wish there was more room to print more of it.

"Please let me know if any further information regarding those events has come to your attention. Thank you very much for your help.

"Sincerely,"

Kwitny testified that he and his counsel shared amusement at the sentence, "I only wish there was more room to print more of it." (Tr. 268) Both realized that the book contained a damning indictment of Love's journalistic ethics, and that the quoted sentence, although perhaps literally true, would convey precisely the opposite impression from the book, suggesting to Love that Kwitny had praised him. As to the effect that sentence might have on Love's perception of how much of his paper Kwitny intended to use, Kwitny testified that although the very purpose of the letter was to get "something in writing" confirming Love's alleged agreement to let Kwitny use "substantial" portions of his paper, "If anything was said along that line it would have been minor. Our genuine concern was that obviously if this guy realized how this stuff would make him look in light of what his own stories had reported, he would become, as he did, terribly upset, and he might not have gone along with so openly consenting to having this used." (Tr. 269–70)

The letter bears Kwitny's return address. Love, consistent with his untenable claim that the February 21 conversation never took place, acknowledged he received the letter but claimed he had no idea what

conversation it referred to. He never responded to the letter.

The book was published in mid–1984. In early October 1984 Love encountered Kwitny at the New York Athletic Club during a reception both were attending in honor of representatives of the Nicaraguan Sandinistas. (Dx N) Love testified to the confrontation with great emotion at trial, struggling to peer around his lawyer at the defendant because, "I like to look at Mr. Kwitny while I am telling this." (Tr. 348) Love accused Kwitny of both stealing his words and failing to believe them.

"... I said, 'I don't understand it, Mr. Kwitny. You went to the University of Missouri'— ... 'I am from Missouri.' I said, 'We are both journalists, we were both in the Peace Corps at about the same time, our politics seem to be about the same. Why are you doing this to me, Mr. Kwitny?' He said, 'I am terribly sorry, I cannot talk to you now. I have to go get on the receiving line. I hope we can meet in happier circumstances.' My last words to him were, 'I assure you, Mr. Kwitny, we will not.'" (*Id.*)

On October 23, 1984 Love registered the copyright for his 1960 paper. In December 1984, he commenced this action. He sued initially for libel as well as copyright infringement, but his libel claim was dismissed on motion by Judge Owen before the case was transferred to my docket.

*Endless Enemies* was one of two runners-up for a Pulitzer Prize in 1985 in the "General Nonfiction" category. Kwitny testified that although the book was a critical success, he made no money on it. The publisher, Congdon & Weed, is now in bankruptcy.

## II.

Kwitny argues principally that he had Love's permission to quote as he did, citing the February 21, 1983 conversation and his February 8, 1984 letter to Love. Although I do not accept Love's confected denial of the conversation, neither can I accept Kwitny's claim that he received Love's permission to quote "substantial" portions of the paper. It is plain that one of Kwitny's major goals in contacting Love was to secure his consent to use the unpublished work, and that Kwitny took notes of the conversation with full awareness of the significance those notes might have at a later date. He took particular care to note Love's consent, to the extent he gave it— "Told I may quote—With credit. 'Fine.'" —and to squeeze into his notes (Tr. 179) "Several times say I intend to quote some of this." (Dx B) If he had said anything to the effect that his quotation would be substantial, as he testified at trial, that word or one of similar import would have appeared in his notes.

Moreover, those portions of his notes reflecting that Love consented to have his paper quoted must be reconciled with other portions of the notes, particularly with the entry, "May use it [the paper] in a book but haven't gotten around to it." Any consent Love gave during that conversation would have to be read, absent other evidence, as no greater than would permit him to use the paper himself at a later date in a book, should he choose to do so. As set forth more extensively below, Kwitny's verbatim quotation of more than half the paper, and by far the most significant portion of the paper, is entirely inconsistent with such later use by Love.

Rejecting Love's insistence that the February 21, 1983 conversation never happened does not necessarily mean that I must accept Kwitny's version of that conversation. To be sure, there is always the possibility that Love lied outright at trial about the conversation in an attempt to conceal his authorization to Kwitny to copy "substantial" parts of his paper. But the available evidence, particularly Kwitny's notes, suggests more strongly to me that Love's denial resulted either from self-delusion or from the erroneous belief that admission of any degree of authorization during that conversation would automatically lose the case. Neither inference is particularly to Love's credit, but neither compels a finding in Kwitny's favor.

Kwitny's February 8, 1984 letter does not change and in fact reinforces my conclusion about the February 21, 1983 tele-

phone call. In particular, the two-edged sentence that was a source of amusement to Kwitny and his lawyer—"I only wish there was room to print more of it."—because they but not Love were aware that Kwitny's only regret was the inability to criticize Love even more harshly, could only minimize in Love's mind how much of his paper was to be quoted. The above sentence and the observation that "those old events in Iran are only a small portion of the book I've done," are the only two statements in the letter that provide any suggestion of volume. Together, they add up to a half truth tending strongly, in the manner of such fractional verities, to mislead anyone who does not know the other half. In no sense do they convey or confirm an intent to print verbatim half by volume, and far more by figurative weight, of Love's 41–page paper. Accordingly, Love's failure to respond cannot be read as consent to such quotation.

 Kwitny argues that Love granted him an oral nonexclusive license. Although a copyright holder may license another party to use copyrighted material, the defendant must show that he did not exceed the scope of the license. *Power Lawn Mower Parts, Inc. v. Lawn Mower Parts, Inc.,* [1981–83] Copyright L.Dec. (CCH) ¶ 25,317 at 16,796, 16, 798 (W.D.N.Y. August 24, 1981) [1981 WL 1381]. *See also Gilliam v. American Broadcasting Co.,* 538 F.2d 14, 20 (2d Cir.1976). As I have shown, any consent Love gave during that conversation was limited to small excerpts such as would enable Love to publish the paper in the future. Kwitny's verbatim quotation of 50% of the manuscript is, by his own account in his notes of the specifics of the license, outside its scope.

Alternatively, the defense of consent may be viewed as part of the defense of equitable estoppel. Kwitny, however, fares no better here. "It is well settled that 'consent, whether *express* or implied from long acquiescence with knowledge of the infringement, will prevent relief in equity on the principle of estoppel.'" *Wiegand Co. v. E. Trent Co.,* 122 F.2d 920, 925 (3rd Cir.1941) (citation omitted) (emphasis

added), *cert. denied,* 316 U.S. 667, 62 S.Ct. 1033, 86 L.Ed. 1743 (1942). *See also,* N. Boorstyn, *Copyright Law* § 10.25 at 311 (1981) ("To establish the defense of estoppel, the defendant must show that plaintiff knew of defendant's infringing acts, *expressly* or impliedly consented to such acts through inaction or *acquiescence....*)

 The requirements for such an estoppel, used by the Ninth Circuit in *Hampton v. Paramount Pictures Corp.,* 279 F.2d 100 (9th Cir.), *cert. denied,* 364 U.S. 882, 81 S.Ct. 170, 5 L.Ed.2d 103 (1960), and adopted by this Circuit in *Lottie Joplin Thomas Trust v. Crown Pub.,* 456 F.Supp. 531 (S.D. N.Y.1977), *aff'd,* 592 F.2d 651 (2d Cir.1978), are:

(1) the party to be estopped must know the facts of the defendant's infringing conduct;

(2) he must intend that his conduct shall be acted on or must so act that the party asserting estoppel has a right to believe that it is so intended;

(3) the defendant must be ignorant of the true facts, and

(4) he must rely on the plaintiff's conduct to his injury.

3 M. Nimmer, *Nimmer on Copyright* § 13.07 at 13–133 (1988). Although these principles are most often applied to situations involving implied consent arising from inaction over a long period of time, they may be applied with slight and obvious alteration to situations involving express consent. For example, the defendant who argues express consent need not be "ignorant of the true facts." Otherwise, these principles may be applied comfortably to cases involving express oral consent. *Freedman v. Select Information Systems, Inc.,* 221 U.S.P.Q. 848 (N.D.Cal. Jan. 30, 1983) [1983 WL 270] (applying estoppel principles when defendant claimed right to distribute copyrighted computer software as result of "oral license" from plaintiff). Applying those principles here, I find that there was no basis for Love to know as the result of either the February 21, 1983 telephone conversation or Kwitny's February 8, 1984 letter, or both, that Kwitny intended to quote a substantial part of his paper

in *Endless Enemies.* Accordingly, Kwitny had no right to believe he had been authorized to quote the paper to the extent he did.

### III.

Having concluded that Kwitny did not have Love's permission to quote the paper to the extent he did, I must consider Kwitny's claim that his publication nonetheless is protected by the "fair use" doctrine as codified in the Copyright Act, 17 U.S.C. § 107 (1982). Although the 1976 Copyright Act preempted common law copyright, 17 U.S.C. § 301(a), and extended statutory protection to unpublished works, § 107 provides that "fair use" does not infringe a copyright, and gives examples of such use as well as four non-exclusive factors to be considered in determining whether a particular challenged use is a fair use.[7] "This approach was 'intended to restate the [pre-existing judicial doctrine of fair use, not to change, narrow, or enlarge it in any way.'" *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 549, 105 S.Ct. 2218, 2225, 85 L.Ed.2d 588 (1985) (quoting H.R. Rep. No. 1476, 94th Cong., 2d Sess. 66 (1976), *reprinted in* 1976 U.S.Code Cong. & Admin.News 5659, 5680).

The fair use doctrine, "firmly planted in the early English common law," *Maxtone–Graham v. Burtchaell*, 803 F.2d 1253, 1259 (2d Cir.1986), *cert. denied*, 481 U.S. 1059, 107 S.Ct. 2201, 95 L.Ed.2d 856 (1987), permits others than the copyright owner to use copyrighted material without the owner's consent. Its justification lies in the very purpose of copyright protection—"to promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries." U.S. Const., art. I § 8. The fair use doctrine promotes that goal by defining instances when the law will "'subordinate the copyright holder's interest in a maximum financial return to the greater public interest in the development of art, science and industry.'" *Rosemont Enter., Inc. v. Random House, Inc.* 366 F.2d 303, 307 (2d Cir.1966) (quoting *Berlin v. E.C. Publications Inc.* 329 F.2d 541, 544 (2d Cir.1964)), *cert. denied*, 385 U.S. 1009, 87 S.Ct. 714, 17 L.Ed.2d 546 (1967).

These principles underlie the four factors enumerated in the statute, which do not so much define fair use as provide subjects to consider in determining when it is present. *New Era Publications Int'l v. Henry Holt and Co.*, 695 F.Supp. 1493, 1499 (S.D.N.Y. 1988). Although "the fair use determination often requires a complex and subtle evaluation of numerous mixed issues of fact and law," *Maxtone*, 803 F.2d at 1259, and the statute itself was drafted so as to leave courts free to adapt the doctrine as the facts may require, *id.* at 1260, such that extensive analysis is often necessary, *see, e.g., New Era*, that is not to say that there is no such thing as a straightforward case that can be resolved by considering the four factors Congress has gleaned from the common law. This is such a case.

1. *Purpose and Character of the Use—* Here Kwitny argues, and I agree, that his book may be considered in any of several categories commonly regarded as potentially fair use, and enumerated in the statute, including criticism, comment, scholarship and, notwithstanding the time lapse between the underlying events and the book, news reporting. Nor is the fact that Kwit-

---

7. 17 U.S.C. § 107 provides as follows:
 Notwithstanding the provisions of section 106, the fair use of a copyrighted work, including such use by reproduction in copies or phonorecords or by any other means specified by that section, for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright. In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include—

 (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
 (2) the nature of the copyrighted work;
 (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
 (4) the effect of the use upon the potential market for or value of the copyrighted work.

ny's use of the material was for a commercial rather than a nonprofit purpose a basis for finding that this factor necessarily weighs against him. *Salinger v. Random House, Inc.*, 811 F.2d 90, 96 (2d Cir.), *cert. denied,* — U.S. ——, 108 S.Ct. 213, 98 L.Ed.2d 177 (1987); *Maxtone,* 803 F.2d at 1262.

■ However, Kwitny next invites a leap that the cases do not justify and that I am unwilling to make. He argues in essence that because his treatment of both Love's account and his conduct may be viewed as criticism, comment, scholarship and news reporting, he was either compelled or entitled to use a huge proportion of Love's protected words to make his point. (Tr. 170–71) That Kwitny considered Love's account "astonishing and telling," wanted to give his readers "the full flavor," and sought to dispel disbelief by using another author's account to lend "an air of authenticity to the facts that are in it," does not make his use "fair" for copyright purposes. The dilemma posed by a choice between copying and the risk of distortion was considered by the Second Circuit explicitly in *Salinger* and found insufficient to justify a decision to copy. As the court noted in that case, "the copyright owner secures protection only for the expressive content of the work, not the ideas or facts contained therein, [citation omitted] a distinction fundamental to copyright law and of special significance in determining whether infringement has occurred in a work of ... historical or contemporary events." *Salinger,* 811 F.2d at 95. Accordingly, "[t]his dilemma [distortion or copying] is not faced by the [author] who elects to copy only the factual content of [a protected work]. The [author] who copies only facts incurs no risk of [liability]; he has not taken copyrighted material." *Salinger,* 811 F.2d at 96. Kwitny was perfectly free to use with impunity the facts Love presented in his paper, including the facts surrounding Love's own conduct. He was not free to use Love's own words.

The expert academic testimony Kwitny offered at trial as to how important the disclosures in Love's paper are to an understanding of events in Iran does not generate a different result. What is important are the facts, which are separate from Love's narration of them. The facts are not protected by copyright; the narration is. To the extent that the expert testimony offered by Kwitny conflicted with those principles, and asserted that the narration was somehow crucial, it was, in my view, mere *ipse dixit.*

■ Kwitny presented at trial an additional justification that warrants no greater protection from a copyright infringement claim than the one rejected in *Salinger:*

"And another reason [for using extensive quotations], quite frankly, was that I have become very conscious over the years of libel and the problems that it raises, and I have learned that by quoting a person's own words you can avoid libel problems. I wanted it very clear that this is what he said, that I wasn't paraphrasing, I wasn't making this up, these were his own words." (Tr. 171)

Once again, Kwitny could protect himself from a successful libel claim by reporting facts accurately, or at least accurately enough to survive the allegation that he acted "in a grossly irresponsible manner without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible parties." *Chapadeau v. Utica Observer-Dispatch,* 38 N.Y.2d 196, 199, 341 N.E.2d 569, 572, 379 N.Y.S.2d 61, 64 (1975).[8] It is not that it is unfair to use a man's own words against him, simply that poetic justice is not the sort of fairness protected by the doctrine of "fair use."

Thus, although the purpose of the use in Kwitny's book may count in his favor it provides no particularly compelling justification for substantial use of Love's copyrighted words.

■ 2. *Nature of the Copyrighted Work*—This factor weighs heavily in

---

**8.** There is no doubt that the subjects Kwitny wrote about are "arguably within the sphere of legitimate public concern, which is reasonably related to matters warranting public exposition," *id.,* so as to warrant applying the *Chapadeau* standard.

Love's favor because the copyrighted work in this case was unpublished. "Under ordinary circumstances, the author's right to control the first public appearance of his undisseminated expression will outweigh a claim of fair use." *Harper*, 471 U.S. at 555, 105 S.Ct. at 2228.

Kwitny insists that these are not "ordinary circumstances" essentially for three reasons: first, that Love's paper is fact rather than fiction; second, that Love did give copies of his paper to certain persons, and thus the paper, although Kwitny does not argue that it has been published, is not quite as unpublished as, say, the private letters in *Salinger;* third, that Love's paper and Kwitny's book serve different purposes.

■ The first of these reasons requires little discussion. That Love's words described facts did not warrant using his words, particularly when there was nothing to stop use of the facts he presented. *Salinger*, 811 F.2d at 96.

■ Second, I conclude from the evidence at trial that Love's distribution of the paper to two professors at Princeton, and to Allen Dulles, and his permission to professors Rubin, Dorman, Farhang and Gasiorowski to use particular portions of the paper cannot be construed as dedicating his paper to wholesale use in the academic or any other community. Indeed, the restrictions he placed on Professor Rubin's use of the paper, even as to the form used to cite it, suggest Love intended to retain control over its use. Kwitny's own notes reflect that Love was still considering in 1983 using his paper in a book. As to Kwitny's suggestion that Love's failure to sue CounterSpy for its unauthorized publication of excerpts from the paper, Love provided a perfectly credible explanation at trial: he believed the magazine was judgment proof. *Diamond v. Am–Law Publishing Corp.*, 745 F.2d 142 (2d Cir.1984), involving a letter to the editor which, although unpublished, was intended by its author to be published, does not control here.

The third argument, that the two works serve different functions, is to a substantial degree incorrect and, to the extent correct, is insufficient. Here, Kwitny's own introduction to approximately 16 pages that consist mostly of Love's words makes the point nicely: "The best record of how this repression of Iranian independence started comes from the pen of Kennett Love, who was the *New York Times* reporter in Iran in 1953." Kwitny at 160. That is to say, Kwitny relies heavily in his book on Love's account to describe for his readers what happened at the time. To that extent, the two works serve the identical function. That Kwitny also criticizes Love, the CIA and others cannot itself deprive Love's paper of the protection ordinarily given to unpublished works. To do otherwise would be to create an exception that would swallow the rule.

3. *Amount and Substantiality of the Portion Used in Relation to the Copyrighted Work as a Whole*—By any test, this factor must be counted overwhelmingly in Love's favor. Kwitny used more than half the words in Love's unpublished paper, but even this large amount does not begin to measure the substantiality of the taking. I have found it instructive to mark those portions of Love's paper quoted in Kwitny's book and then to read what remains. Eliminating connecting phrases and matter that simply restates or elaborates slightly what is quoted, what remains is a brief description of Iranian politics and U.S.–Iran relations during and just after World War II, of the sort one might find in a textbook, and the author's analysis of the options facing the United States just before the coup. What remains would not justify the title of the paper, "The American Role in the Pahlevi Restoration." If what the Supreme Court refused to permit in *Harper & Row* was a taking of "essentially the heart of the book," 471 U.S. at 564–65, 105 S.Ct. at 2233, the taking here involves nearly every vital organ of the paper.

Although Kwitny does not seem to argue the point explicitly, I am mindful of the fact that the substantiality of the unauthorized quotation must be measured not against zero but against what I have found Love permitted, as reflected in Kwitny's notes of the February 21, 1983 conversa-

tion and his February 8, 1984 letter to Love—*i.e.*, that Love said he "May use it [the paper] in a book but haven't gotten around to it," and Kwitny "Told I may quote—With credit. 'Fine.' Several times say I intend to quote some of this," (Dx B); as well as, "I want to assure you again that the passages I have selected to use are clearly marked off as quotes and credited to you in the text. I only wish there was room to print more of it." (Dx C) To be sure, that would not provide a clear standard against which to measure a claim of slight excess in quotation. But in this case what has been taken is more than "some of" a paper Kwitny was aware Love might wish to use in a book at a later date, particularly attended by Kwitny's expressed regret that there was not room for more. I have no difficulty finding that there was substantial unauthorized quotation beyond what any reasonable author would have expected based on the exchange between Kwitny and Love.

■ 4. *Effect Upon the Potential Market for or Value of the Copyrighted Work* —This is the single most important factor to consider in determining whether a particular unauthorized use has been fair, because fairness must include no material impairment of the marketability of a copied work. *Harper & Row*, 471 U.S. at 566–67, 105 S.Ct. at 2233–34.

■ Kwitny argues that the record reflects no more than "uncrystallized plans" by Love to publish the paper, *Maxtone*, 803 F.2d at 1264, and offers the bland assurance that Love apparently never intended to publish his paper and that even such uncrystallized plans as he expressed could not be materially impeded because the market for a criticism of Love's paper is different from the market for Love's paper itself. Yet even assuming arguendo that Love, contrary to what he told Kwitny, did not intend to publish his paper in any form, he "has the right to change his mind. He is entitled to protect his *opportunity* to sell" his paper. *Salinger*, 811 F.2d at 99 (emphasis in original). Nor do I see any basis to slice the market as Kwitny proposes so as to differentiate those interested in

reading Kwitny's views and Love's account together, from those interested in reading Love's account alone, rather than considering simply all who may be interested to learn what happened in Iran during the relevant period and why it happened. In view of the substantial reproduction of Love's paper in Kwitny's book, I conclude that "some impairment of the market seems likely." *Id.* Accordingly, this factor, too, favors Love.

■ The factors listed in the statute are not meant to be exclusive, and the statute itself "provides no real instruction as to how the conclusion is to be drawn upon consideration of these factors," *New Era*, 695 F.Supp. at 1500, although the Supreme Court has found that the last factor is the most important. *Harper & Row*, 471 U.S. at 566–67, 105 S.Ct. at 2233–34. However, when the enumerated factors weigh as heavily as they do here in favor of plaintiff, how a more delicate balance might have to be struck is of academic concern only. The substantial quotation of Love's paper in *Endless Enemies* was not fair use.

\* \* \*

For the above reasons, which shall constitute my findings of fact and conclusions of law for purposes of Fed.R.Civ.P. 52(a), defendant is found liable to plaintiff for copyright infringement.

SO ORDERED.