Thomas Alexander DALLAL, Plaintiff,

v.

The NEW YORK TIMES COMPANY, et al., Defendants.

No. 03 Civ. 10065(AKH).

United States District Court, S.D. New York.

May 12, 2005.

Eric Vaughn Flam, Rubin, Bailin, Ortoli, Mayer & Baker, Marc Vaugh–Flam, P.C., New York City, for Plaintiff.

George Freeman, Lgal Department Robert Penchina, Levine Sullivan Koch & Schulz, L.L.P., New York City, for Defendants.

### MEMORANDUM AND ORDER GRANTING MOTION FOR SUMMARY JUDGMENT AND DENYING CROSS–MOTION FOR ADVERSE INFERENCE

HELLERSTEIN, District Judge.

Plaintiff, Thomas Alexander Dallal, a freelance photographer, accepted assignments from Defendant New York Times (the "Times") between the years 1994–2002 to take and submit photographs in connection with news and other articles that the Times planned to publish. The Times paid Dallal a fixed amount for each assignment—$200 per day plus expenses. Dallal reserved the right to copyright and sell the photographs that he submitted. By 1997, Dallal began including in the bills he submitted to the Times language to the effect that he was granting a "first exclusive, one time use" of his photographs. As of 1998 and through 2002, the invoices typically contained the following clause:

> for distribution within the United States of America and Canada only; ENGLISH language rights only; . . . for ONE–TIME ONLY, FIRST EXCLUSIVE USE; in both COLOR and BLACK & WHITE illustrations. All

rights not specifically granted in writing, including copyright, remain the exclusive property of the photographer.

Beginning in 1996, the Times began publishing an edition of its paper on the internet. By letter of May 6, 1997, Dallal complained that he should receive extra compensation because of the Times' internet edition, stating that "[o]ther clients I work for pay additional assignment or usage fees for electronic use." The Times refused to pay extra, and Plaintiff continued to accept assignments as previously, at the same rate of $200 per day plus expenses. Plaintiff continued, however, to complain orally about not being paid more, without being able to change the Times' position and without ceasing to accept assignments from the Times. Finally, on November 25, 2002, Plaintiff asserted a copyright position, demanding, by letter addressed to the Times' then-Picture Editor, Margaret O'Connor, that the Times cease using his photographs on its websites "without my permission," and accusing the Times of so doing "since 1997," and "in violation of my copyrights." Plaintiff demanded that the Times "cease using my images on its websites immediately."

The Times responded by email dated December 5, 2002, expressing that it was unaware that the photographs submitted by Plaintiff and used in its web editions were being used contrary to his permission. The Times stated that it would immediately stop using the photographs, removed the photographs from its web editions, and discontinued offering assignments to Plaintiff.

A year later, on December 19, 2003, the commercial relationship between the Times and Plaintiff having ended, Plaintiff filed his complaint, charging copyright infringement of 113 photographs published by the Times between January 1997 and December 2002, and which Plaintiff registered with the Copyright Office between May 2002 and January 2003. After discovery, the Times moved for summary judgment dismissing Plaintiff's complaint. Plaintiff opposed and cross-moved for an adverse inference because of alleged discovery abuse pursuant to Fed.R.Civ.P. 37(b)(2)(A).

For the reasons stated on the record at oral argument on April 14, 2005, I deny Plaintiff's cross-motion. For the reasons stated below, I hold that Plaintiff is equitably estopped from claiming copyright infringement and, accordingly, I grant Defendants' motion for summary judgment.

### Discussion

The issue of copyright infringement, 17 U.S.C. § 501, between the owner of copyright in a collective work, and the owner of copyright in a separate contribution thereto, *id.* § 201(c), is a thorny one. *Compare New York Times Co. v. Tasini,* 533 U.S. 483, 121 S.Ct. 2381, 150 L.Ed.2d 500 (2001), *with Faulkner v. National Geographic Enterprises Inc.,* 409 F.3d 26 (2d Cir.2005). Because equitable estoppel is so clear, I do not have to reach the issue.

Case law in this circuit has fleshed out the application of equitable estoppel in the realm of copyright. *See Lottie Joplin Thomas Trust v. Crown Publishers,* 456 F.Supp. 531 (S.D.N.Y.1977), *aff'd,* 592 F.2d 651 (2d Cir.1978); *see also* 4–13 Nimmer on Copyright § 13.07 ("Principles of estoppel applicable elsewhere in the law are equally applicable in copyright infringement actions."). Equitable estoppel "applies both in law and in equity to deny a party the right to plead or prove an otherwise important fact—here, the act of infringement—because of something he has done or omitted to do." *Broadcast Music, Inc. v. Hearst/ABC Viacom Entertainment Services,* 746 F.Supp. 320, 329 (S.D.N.Y.1990) (Keenan, J.). In order for a defendant to prevail on a defense of equitable estoppel, "the defendant must

have been misled into reasonably and justifiably believing that the plaintiff would not pursue his claims against the defendant." *Encyclopedia Brown Prod., Ltd. v. Home Box Office, Inc.*, No. 91 Civ. 4092, 1998 WL 734355, at *13 (S.D.N.Y. Oct. 15, 1998) (Leisure, J.) (citations omitted).

In a copyright action, "the plaintiff-copyright holder's rights may be destroyed if the defendant shows that: a) the plaintiff knew of the defendant's wrongful conduct; b) the plaintiff intended that his conduct be acted upon or acted in a way that the defendant had a right to believe it was so intended; c) the defendant was ignorant of the true facts; and d) the defendant relied on plaintiff's conduct to his detriment." *Id.* It has been noted that the "defendant who argues express consent need not satisfy the third prong of equitable estoppel, and thus need not be ignorant of the true facts." *Id.* at *14 (quotation omitted). Assuming for the purposes of the first element that publication on the web was "wrongful," it is undisputed that Dallal knew of Defendants' conduct beginning in 1997, and hence the first element is satisfied.

I apply the remaining elements with an eye to Judge Leisure's rulings in *Encyclopedia Brown*. In brief, the main plaintiff in that case, Encyclopedia Brown Productions, Ltd. ("EBP"), entered into an agreement on March 10, 1988 with Home Box Office, Inc. ("HBO") whereby HBO was granted, among other things, a certain number of options, each for a minimum of twelve episodes. In July 1989, some time after production and delivery by EBP of a pilot program to HBO, the president and controlling shareholder of EBP, Deutsch, informed an attorney for HBO, Louis, that the time for exercising one of the options for subsequent programming had passed but that if HBO would order fewer than twelve episodes, a new agreement would need to be negotiated, supplanting the original March 10, 1988 agreement. Louis responded, instead, by proposing an amendment to the original agreement and purporting to exercise an option for six, rather than twelve, episodes. Deutsch, on August 2, 1989, insisted that any production of the six episodes would have to proceed through a new agreement. Also in July 1989, and apparently through February 1990, attorneys for the parties commenced negotiations over an amendment to the original agreement; Deutsch, however, continually declined to sign proposed amendments, citing additional concerns. Nevertheless, in February 1990, Deutsch expressed dissatisfaction with efforts by HBO to promote the six episodes; he even hired an independent publicist to promote them. Thus, even as negotiations progressed without result, EBP produced and delivered the six episodes to HBO, the latter paying several hundred thousand dollars per episode delivered.

In the course of litigation, however, plaintiffs sought summary judgment on their claim of copyright infringement in the six episodes they produced on the theory that since no valid amendment to the original agreement, which provided an option for no less than twelve episodes, ever materialized, the "defendant's unlicensed exhibition of the six (6) episodes infringed plaintiffs' copyrights." *Id.* at *13. The district court found the plaintiffs equitably estopped from asserting copyright infringement claims, citing ongoing payments by HBO and delivery of master tapes of the episodes by EBP while the episodes were airing; Deutsch's very encouragement of HBO to publicize its exhibition of the episodes; and Deutsch's hiring of an agent to publicize the HBO exhibition. *Id.* at *14.

The facts in the case before me present an equally compelling case for equitable estoppel. The parties' course of

dealing spanned some eight years. Six of those eight years overlapped with the period in which the Times introduced a web edition of its newspaper. *See Cherry River Music Co. v. Simitar Entertainment, Inc.*, 38 F.Supp.2d 310, 319 n. 54 (S.D.N.Y. 1999) (Kaplan, J.) (noting, in analysis of estoppel in copyright infringement case, that "[t]he Second Circuit has explained that a prior course of dealings material for contract purposes exists when the parties have a 'well-established custom' established in 'numerous purchases over a period of time,'" and finding "three unrelated transactions over a three year period ... insufficient to establish a course of dealing in the sense the term is used in the law" (quoting *New Moon Shipping Co. v. MAN B & W Diesel*, 121 F.3d 24, 31 (2d Cir. 1997))).

It is true that Dallal several times expressed his dissatisfaction with the terms of the Times' compensation for freelance assignments, as outlined above. It is also true that as early as 1996, Dallal adopted an invoice template with licensing language, which he continued to use until the termination of the parties' relationship. *See* Decl. of Robert Penchina, dated Dec. 1, 2004, Ex. B, at 50–51 (Dallal Dep.). However, the principles of estoppel "are most often applied to situations involving implied consent arising from inaction over a long period of time." *Love v. Kwitny*, 706 F.Supp. 1123, 1131 (S.D.N.Y.1989) (Mukasey, J.). Dallal's conduct, analogous to the plaintiffs' in *Encyclopedia Brown*, may be thought of as a protracted attempt to negotiate a better deal for himself while the parties continued in their longstanding compensation arrangement, but it displays inaction in pursuing a claim for copyright infringement. Accordingly, Defendants have met the requirements of the second element for estoppel.

I will assume that Plaintiff's conduct did not give rise to express consent, *but*

*cf. Encyclopedia Brown*, 1998 WL 734355, at *14, and so, under the third element, Defendants must show that they were "ignorant of the true facts." While Dallal presents several instances in which his complaints were acknowledged by the Times, these acknowledgements do not constitute an awareness of copyright infringement. Plaintiff's characterization of his May 6, 1997 letter to Jim Simpson as a "cease and desist letter" is fatuous. *See* Compl. ¶ 30. The first arguable example of awareness by the Times of Plaintiff's position is the December 5, 2002 email from the Picture Editor, O'Connor, in response to Plaintiff's arresting November 25, 2002 letter. Decl. of Thomas Alexander Dallal, dated Jan. 14, 2005, Ex. J. ("I was not aware that the web was using your pictures without your permission and have told them to stop."). There is no material fact in dispute on this point, and so I hold this element is also satisfied. I also hold that the fourth and final element, that of detrimental reliance by Defendants, is satisfied, since the Times clearly proceeded on the understanding that its relationship with Dallal, which it could have terminated at any point in favor of what was, no doubt, a ready pool of photographers willing to freelance for the Times, was acceptable to both parties.

Accordingly, for these reasons, I hold that Plaintiff is equitably estopped from making claims of copyright infringement.

The clerk of the court shall mark this case as closed.

SO ORDERED.