Kennett LOVE, Plaintiff,

v.

Jonathan KWITNY; Congdon & Weed, Inc.; St. Martin's Press, Inc.; Book–Of–The–Month Club, Inc.; Barnes & Noble Bookstores, Inc.; B. Dalton Company, Coliseum Books; Doubleday Doran Book Shops, Inc.; and John Kelly, Defendants.

Kennett LOVE, Plaintiff,

v.

CITY OF NEW YORK, Edward I. Koch, Mayor; Department of General Services (of the City of New York), Hadley W. Gold, Commissioner; WNYC Communications Group, Mary Perot Nichols, President, Madison D. Lacy, Vice President and General Manager, Television; and Jonathan Kwitny, Defendants.

Nos. 84 Civ. 9289 (MBM), 88 Civ. 7562 (MBM).

United States District Court, S.D. New York.

Aug. 26, 1991.

---

Stefan Bauer–Mengelberg, New York City, for plaintiff.

John C. Lankenau and Robert D. Balin, Lankenau & Bickford, New York City, for defendants.

### OPINION AND ORDER

MUKASEY, District Judge.

The parties are before this court for what should be the last time in order to resolve two matters: (i) the relief to which plaintiff is entitled as a result of defendants' copyright infringement, and (ii) whether the record before Judge Owen, and later before me, justifies the conclusion that defendants and their counsel violated Fed.R.Civ.P. 11. This case has been the subject of three prior opinions in this court, one by Judge Owen dismissing the libel claim, *Love v. Kwitny*, 1987 WL 5799 (S.D.N.Y.1987), and two by me—the first determining the copyright infringement claim, *Love v. Kwitny*, 706 F.Supp. 1123 (S.D.N.Y.1989), and the second dismissing plaintiff's claim for statutory damages and attorney's fees. *Love v. Kwitny*, 1989 WL 140578 (S.D.N.Y.1989). Familiarity with those prior opinions is assumed for current purposes.

For the reasons set forth below, plaintiff will recover of the following defendants either the amounts specified, which are the fair proportion of each of their profits from the sale of "Endless Enemies" that may be attributed to the infringement, or, as to Kwitny, costs, which shall include the cost of serving him with the summons and complaint when he failed to acknowledge service by mail:

Book of the Month Club—$422.18

St. Martin's Press—$607.72

BDB Corporation—$152.39

Jonathan Kwitny—costs to be taxed

No injunction will be entered restraining further sale of the book or requiring destruction of remaining copies or plates. Plaintiff's motion for Rule 11 sanctions is as meritless as it is tendentious—which is to say, utterly—and is denied in all respects. Plaintiff is found to have violated Rule 11 by filing a meritless Rule 11 motion, but will suffer no sanction beyond the sting of that finding.

### I.

The parties have stipulated that Love has waived any claim for his own lost profits pursuant to 17 U.S.C. § 504(b). In view of the earlier dismissal of his claim for statutory damages pursuant to 17 U.S.C. §§ 504(c) and 505, that leaves only a claim for profits of defendants attributable to their infringement of the copyrighted work. 17 U.S.C. § 504(b). The parties differ over the percentage of profits from "Endless Enemies" attributable to the infringement.

The parties have stipulated also the gross revenues of each of the defendants, and certain expenses which plaintiff concedes may be deducted from gross revenues to determine profits; they have stipulated as well the amounts of the expenses in the categories of deductibility they dispute. Those disputed categories are overhead expenses, royalty payments and income taxes. The parties disagree also as to whether an award of prejudgment interest or costs is appropriate in this case.

## A. Percentage of Profits Attributable to Infringement

■ The parties have stipulated that the infringed portion of plaintiff's manuscript accounted for 11 pages of Kwitny's 421-page book.

Plaintiff does not so much argue an appropriate percentage of profit to be attributed to the infringement here as throw out hints based on what courts have done in other cases and suggest that any substantial percentage up to 100% of defendants' profits would be appropriate. Thus, he cites dictum in a footnote in *ABKCO Music, Inc. v. Harrisongs Music, Ltd.*, 508 F.Supp. 798, 801 n. 10 (S.D.N.Y.1981), *modified*, 722 F.2d 988 (2d Cir.1983), to the effect that no apportionment is necessary in cases involving willful plagiarism. He points out that plaintiff in *Smith v. Little, Brown & Co.*, 273 F.Supp. 870, 874 (S.D.N.Y.1967), *aff'd*, 396 F.2d 150 (2d Cir. 1968), was awarded all of defendant's profits even though the material plagiarized in that case was "comparatively small" in relation to the size of the full work. He notes that plaintiff in *Blackman v. Hustler Magazine, Inc.*, 620 F.Supp. 792 (D.D.C.1985), *aff'd in part and rev'd in part*, 800 F.2d 1160 (D.C.Cir.1986) was awarded 60% of defendant's profits for one infringement when the infringing material constituted at most 4.4% of the publication, and was awarded 35% of the profits for a second infringement when the material in question constituted 4.7% of the publication.

We may be dealing here with guile by Kwitny, as the opinion on the liability phase of the case pointed out, 706 F.Supp.

at 1133, but we are not dealing with willful plagiarism—the passing off of someone else's work as one's own. Nor is this case analogous to *Smith*, where the plagiarized material was the outline for a novel then expanded and sold by defendant, such that the small amount taken infected the entire resulting work.

Nor can this case be analogized to *Blackman*, where the infringed material—copyrighted nude photographs of plaintiff's former model Elizabeth Ray, who was "catapulted ... into the public eye" by the disclosure of her relationship with a United States Congressman, 620 F.Supp. at 794—was used as a "lure to attract readers." *Id.* at 801. Despite plaintiff's extravagant claims that his work was a "central feature" of "Endless Enemies" (Plaintiff's Brief on Damages, p. 10), there was but one oblique reference to plaintiff in the numerous reviews submitted as exhibits to the stipulation between the parties (Stipulation, Exh. L), and his manuscript and its treatment were not used at all in promotional material about the book. (Stipulation Exhs. F–K) That is not surprising. The treatment Love's manuscript received in Kwitny's book, as opposed to the noncopyrightable facts it contained, was beside the point of the book; "Endless Enemies," after all, was about what the author felt were the follies of this country's foreign policy, not the alleged foibles of its journalists. By no stretch of even the most salaciously elastic imagination do excerpts from Love's manuscript stand in relation to Kwitny's book as Blackman's photographs of Ms. Ray stand in relation to Hustler Magazine.

Defendants argue that because the infringing material amounted at most to about 2.6% of the book, plaintiff should be limited to 2.6% of the profit. The book dealt with U.S. foreign policy throughout the world; by no means did it focus solely or even substantially on events in Iran in 1953. Certainly, the infringed material cannot be said to amount to more than 2.6% of the book, and I believe that figure is generous to plaintiff because it necessarily

includes the impact that results from use of non-copyrightable facts.

## B. Deductible Expenses

■ Defendants urge that overhead expenses be calculated by allocating to proceeds from sales of "Endless Enemies" both direct and indirect overhead expenses in the same proportion that those expenses bear to each defendant's net sales for the relevant year. That is known as the "full absorption" approach, and the authority in this jurisdiction supports its use, as reflected in Judge Knapp's comprehensive opinion in *Warner Brothers, Inc. v. Gay Toys, Inc.,* 598 F.Supp. 424, 428–29 (S.D.N.Y.1984), and cases cited therein.

■ Plaintiff urges that no infringing defendant should be allowed to deduct income taxes for purposes of computing profits. His position finds strong support in *Schnadig Corp. v. Gaines Mfg. Co.,* 620 F.2d 1166, 1169–71 (6th Cir.1980), where the Court in a patent case analyzed what happens when an infringer is allowed to subtract taxes before calculating profits payable to the plaintiff and concluded, correctly, that the result is a profit to the infringer. That analysis was as follows:

"When an infringer is required to pay damages to a design patentee, the amount so paid is deductible from his income tax. To illustrate, if a company earned a net pre-tax profit of $100 by infringing, paid $50 in tax, and paid the remaining $50 as damages to the patentee, the infringer would have no remaining cash, but would have a $50 tax deduction available to him. At our fictional 50% tax rate, this deduction would be worth $25 to the infringer, and if the deduction is fully utilized it would represent a $25 net overall gain on the infringement. The reciprocal of the infringer's deduction of the award is the patentee's inclusion of the award in his gross income. Retaining our fictional 50% tax rate, the patentee will keep only $25 of the $50 award, paying the other $25 in tax. In that hypothetical, but very realistic, possibility, the infringer nets as much as his victim, and perhaps even more if the dynamics of the money market are considered."

620 F.2d at 1169.

The corporate defendants, in a footnote, distinguish that case as having arisen under the patent laws, but offer no explanation why the Sixth Circuit's logic does not apply as forcefully to copyrights as to patents. Rather, they argue that relevant authority in this Circuit would disallow the deduction of income taxes only in cases involving willful behavior, and that because this case discloses no such conduct by those defendants, they should be permitted to deduct taxes in computing profits. *Alfred Bell & Co. v. Catalda Fine Arts, Inc.,* 191 F.2d 99, 106 (2d Cir.1951); *Sheldon v. Metro–Goldwyn Pictures Corp.,* 106 F.2d 45, 53 (2d Cir.1939) (L. Hand, J.), *aff'd,* 309 U.S. 390, 60 S.Ct. 681, 84 L.Ed. 825 (1940); *Gay Toys, supra,* 598 F.Supp. at 431.

However, those cases did not deal directly with whether a non-willful infringer should be permitted to deduct from profits amounts paid as income taxes, but only with whether a willful infringer should be allowed to do so. In *Sheldon,* the first case in this Circuit to suggest that principle, the Court of Appeals reversed a master's decision to allow an infringer to deduct income taxes. The master had concluded that defendants were not deliberate plagiarists; the Court of Appeals concluded otherwise, and disallowed the deduction of income taxes, commenting as follows:

"It does indeed seem somewhat arbitrary to distinguish this from other expenses necessary to the business; yet on the other hand the distinction illustrates that in dealing with a conscious wrong-doer, courts do not feel obliged for consistency's sake to take one extreme or the other."

*Sheldon,* 106 F.2d at 53.

The fallacy in that passage lies in its reference to taxes as "other expenses necessary to the business." Only in a vernacular sense are taxes "expenses." Federal income taxes are calculated by multiplying the tax rate by "taxable income"—which itself is the difference between gross in-

come and deductible expenses. 26 U.S.C. §§ 1, 63. In other words, income taxes are a *function* of income rather than an element of the expenses that one subtracts from gross revenues in order to calculate income. The tax code, which permits the full amount paid as damages (although not fines and penalties) to be deducted, *see* 26 U.S.C. § 162; *Schnadig*, 620 F.2d at 1169, n. 7, should not be disregarded when a court considers the treatment under the Copyright Act of amounts paid as income tax. As the analysis in *Schnadig* demonstrates, the deductibility of damages under the tax code enables the infringer to pay only his full gain from the infringment and avoid any out-of-pocket loss even if he cannot deduct income taxes before calculating "profits of the infringer attributable to the infringement" under § 504(b) of the Copyright Act. However, permitting the infringer to deduct income taxes before calculating "profits" effectively allows the infringer to retain as profits an amount equal to the product of his marginal tax rate times that profit because he pays the copyright owner his total after-tax profits *during the period of infringement* only, but then gets a full deduction for that payment in the later tax year when the payment is made, without having to share the fruits of that deduction with his victim.

The suggestion in *Sheldon* and *Catalda* that income taxes may be deducted by a non-willful infringer was not necessary to the decision in those cases, both of which dealt with willful infringers. That suggestion, therefore, is dictum. Moreover, it does not appear to be the sort of considered dictum that was intended to announce a rule or serve as a guide to district courts in the future. *Cf., United States v. Oshatz*, 912 F.2d 534, 540 (2d Cir.1990). Therefore, notwithstanding the eminence of the author of *Sheldon*, there should be no distinction between willful and non-willful infringers as to deductibility of income taxes. Neither should be allowed to deduct them in calculating profits under the Copyright Act. Accordingly, the damages calculation does not allow for deduction of the corporate defendants' income taxes as set forth in the stipulation between the parties.

(Stipulation, ¶¶ 10, 21, 33) There is no issue of income taxes as to Kwitny because he made no money on the book.

To the extent plaintiff's argument focuses on items claimed by particular defendants, those are treated below.

1. Book of the Month Club

■ Plaintiff disputes this defendant's deduction of royalty payments to Congdon & Weed, citing Judge Frankel's decision in *Kingsrow Enterprises, Inc. v. Metromedia, Inc.*, 203 U.S.P.Q. 598 (S.D.N.Y.1978), where he held that defendant "should not as a matter of law or fairness be allowed to fob that effort off on the plaintiff." *Id.* at 600. Defendant's response is rather less helpful than it might have been, apparently because defendant confined its search for that quotation to the Westlaw segment attached as Exhibit B to its reply brief, which includes only a summary order. Had defense counsel consulted the book plaintiff cites, published by the Bureau of National Affairs, rather than relying on the electronic data base compiled by that publisher's competitor, they would have found the quotation set forth above and perhaps been in a position to point out that the licensor recipient of the royalty there at issue was not a party to the litigation, unlike Congdon & Weed here, and thus that plaintiff would have had to file an additional lawsuit to collect the sum. In any event, there was nothing improper about payment of the royalty, which was a legitimate expense, and authority supports a deduction. *Smith v. Little, Brown & Co.*, 396 F.2d 150, 151–52 (2d Cir.1968), and cases cited therein.

2. Kwitny

■ Kwitny has asserted that it cost him more to write "Endless Enemies" than he made on it, and has attached as proof the Schedules C to his tax returns for the relevant years and records of advances and royalty payments to him. From the stipulation entered into among the parties, and those schedules and exhibits, it appears that Kwitny received a income of $33,335 as a result of "Endless Enemies" (Stipulation, ¶¶ 38–40), and had expenses of $49,038 fairly attributable to writing and distribut-

ing the book, including a $5000 loan to Congdon & Weed to help continue production of the book, which loan was not repaid due to the publisher's bankruptcy, and his purchase of 78 copies of the book for $953.37. (Stipulation, ¶ 41(a)–(c), Exhs. D, E, N, Q) Because Kwitny apparently gave away all or most of those copies, that expenditure cannot be said to have been related to generating income, and should be disallowed. However, that disallowance still does not put Kwitny in the black as to "Endless Enemies."

■ Love's principal argument against allowing these deductions is that Kwitny's tax returns are not proof, in part because they never passed through the crucible of an audit. The returns were prepared and submitted to the Internal Revenue Service under penalty of perjury before Kwitny had any reason to shade them in response to this lawsuit. They are unremarkable, at least to my untrained eye, and plaintiff has not suggested that any claimed expenditure should be regarded as suspicious. Neither has plaintiff suggested any fact or document disclosed during discovery that would blemish the facial sufficiency of the tax returns. We are not dealing here with the kind of failure to keep records that confronted the courts in *Dolori Fabrics, Inc. v. The Limited, Inc.*, 662 F.Supp. 1347, 1357 (S.D.N.Y.1987) (Lumbard, C.J.), *Blackman v. Hustler Magazine, Inc.*, supra, 620 F.Supp. at 799 and *Williams v. Arndt*, 626 F.Supp. 571, 572 (D.Mass.1985), where defendants either failed to submit proof or concocted records for purposes of the lawsuit. The tax returns are proof, and in this case I find them sufficient to establish the deductions claimed.

## C. Prejudgment Interest

There is a substantial debate about whether prejudgment interest is available under any circumstances in copyright cases, Congress having failed to provide for the award of such interest under the Copyright Act although it did provide for such a remedy under the Patent Law, which protects a similar interest. *Compare* 35 U.S.C. § 284 *with* 17 U.S.C. § 505.

This remains a debatable proposition even though our own Circuit has affirmed a copyright award that included prejudgment interest, but did so without addressing the issue. *Lottie Joplin Thomas Trust v. Crown Publishers*, 592 F.2d 651, 656 (2d Cir.1978) Moreover, even if such interest were found available under the 1909 statute, as in *Lottie Joplin Thomas*, there would remain doubt whether it is also available under the 1976 Copyright Act, and whether the rationale for Congressional silence advanced in *Frank Music Corp. v. Metro–Goldwyn–Mayer, Inc.*, 886 F.2d 1545, 1550–53 (9th Cir.1989), *cert. denied*, —— U.S. ——, 110 S.Ct. 1321, 108 L.Ed.2d 496 (1990) as to the 1909 statute applies with equal force to the 1976 statute. *See, e.g., Robert R. Jones Assocs., Inc. v. Nino Homes*, 858 F.2d 274, 282 (6th Cir.1988); *Broadcast Music Inc. v. Golden Horse Inn Corp.*, 709 F.Supp. 580 (E.D.Pa. 1989) (no prejudgment interest available under 1976 Copyright Act, Congress having failed so to provide).

■ However, that is a thicket I need not enter because plaintiff has conceded in his brief that "ordinarily pre-judgment interest is not awarded in copyright cases ..." but notes that "there are times when special circumstances justify an exception to the rule...." (Plaintiff's Brief on Damages, p. 13 (citations omitted)) The only exceptional circumstance plaintiff has advanced is implicit in an excerpt he quotes from *Cutter v. Gudebrod Bros. Co.*, 190 N.Y. 252, 255, 83 N.E. 16 (1907), suggesting that when the amount of damages is clear at the time of infringement, a defendant can avoid the accretion of interest by paying the amount clearly due, and therefore it is reasonable to award interest when the infringer fails to pay such damages immediately. This is not such a case. It would have been impossible for any of the corporate defendants, or even for Kwitny, against whom no damages have been assessed because he made no money on the infringement, to have estimated at the time how much in damages would be attributed to the infringement, even assuming without deciding that they should have anticipated the outcome of the liability trial.

There are no special circumstances here to justify the award of prejudgment interest against those defendants found liable for money damages, either of the sort suggested by plaintiff or of any other sort.

## D. Costs

 Defendants' position on the subject of costs is tucked discreetly into a footnote, which reads in its entirety as follows:

> So too, plaintiff has asserted no grounds for the discretionary award of costs under 17 U.S.C. § 505 or for the award of the costs of personal service under Fed. R.Civ.P. 4(c)(2)(D).

(Defendants' Answering Memorandum of Law on Copyright Damages, p. 10 n. *) That is not entirely true. Plaintiff asserts in his brief that Kwitny did not bother to return the acknowledgment of service that accompanied the summons and complaint. (Plaintiff's Brief on Damages, p. 14) That is enough to require an award of the cost of personal service. Fed.R.Civ.P. 4(c)(2)(D). Moreover, although plaintiff has not specified the grounds on which he requests costs, they are apparent from the opinion on the liability phase of the case. Kwitny was the only active infringer, and he accomplished the infringement with substantial reliance on guile to make it appear that he had obtained Love's authorization to quote without limitation from Love's paper. Moreover, Love's recovery is meager enough without requiring him to bear not only the fees but also the costs of suit. Such a result not only would fail to deter infringement, but would actively encourage it. Those considerations are sufficient to warrant an award of full costs. Of course, the costs must be only those involved in pursuing the copyright claim, and may not involve those generated exclusively by the libel claims.

## E. Injunctive Relief

Although this lawsuit started more than six years ago, and plaintiff at no time sought a temporary restraining order or a preliminary injunction, and although sales of "Endless Enemies" appear to have run their course, plaintiff now asks for a permanent injunction barring distribution of further infringing copies of "Endless Enemies" and directing the "reasonable disposition" of existing copies and "articles by means of which such copies ... may be reproduced," pursuant to 17 U.S.C. § 503(b). Defendants argue that plaintiff should be denied such relief based on one of two equitable doctrines—either laches or estoppel arising from implied consent. However, as defendants concede, laches requires a showing of prejudice, and they have made none other than a general and entirely speculative reference to the hypothetical injury to those members of the reading public who may wish to buy the book but have not yet done so and are unable or unwilling to borrow a copy from a library. Moreover, the estoppel doctrine on which they rely proceeds from an inference of consent based on inaction, a legal fiction that seems particularly inappropriate in this case because plaintiff did, after all, demand an injunction in his complaint.

 Whether or not one might find laches or estoppel in this record, I do not believe it is necessary for defendants to show either unless it is first clear that injunctive relief would be warranted. As Chief Judge Oakes pointed out in a recently published article, injunctive relief in unfair use copyright infringement cases is by no means automatic, even if it might be applied under ordinary circumstances. Oakes, "Copyrights and Copyremedies: Unfair Use and Injunctions," 38 J. COPR. SOC'Y. 63, 78–80 (1990). After all the opinions had been filed in *New Era Publications Int'l v. Henry Holt & Co.,* 873 F.2d 576 (2d Cir.), *reh'g en banc denied,* 884 F.2d 659 (2d Cir.1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 1168, 107 L.Ed.2d 1071 (1990), it was clear that those in the majority and those in dissent agreed at least that an injunction remains a discretionary remedy under the Copyright Act. *Compare,* 884 F.2d at 661 ("Indeed, the discretionary nature of [an] injunction is apparent in the pertinent statutory provision: Any court having jurisdiction of a civil action arising under this title *may* ... grant temporary and final injunctions....") (emphasis in

original), *with,* 884 F.2d at 663–64 ("The panel's holding demonstrates that its language is not to be understood as narrowing the equitable discretion as to the propriety of an injunction, which is conferred by statute.") (Newman, J., dissenting from denial of rehearing *en banc*).

There is no need in this case even to reach equitable issues unique to copyright cases. The outcome here is governed by first principles controlling issuance of injunctions in general, which the Supreme Court has articulated as follows:

"It goes without saying that an injunction is an equitable remedy. It 'is not a remedy which issues as of course,' *Harrisonville v. W.S. Dickey Clay Mfg. Co.,* 289 U.S. 334, 337–38 [53 S.Ct. 602, 603, 77 L.Ed. 1208] (1933), or 'to restrain an act the injurious consequences of which are merely trifling.' *Consolidated Canal Co. v. Mesa Canal Co.,* 177 U.S. 296, 302 [20 S.Ct. 628, 630, 44 L.Ed. 777] (1900). An injunction should issue only where the intervention of a court of equity 'is essential in order effectually to protect property rights against injuries otherwise irremediable.' *Cavanaugh v. Looney,* 248 U.S. 453, 456 [39 S.Ct. 142, 143, 63 L.Ed. 354] (1919). The Court has repeatedly held that the basis for injunctive relief in the federal courts has always been irreparable injury and the inadequacy of legal remedies. *Rondeau v. Mosinee Paper Corp.,* 422 U.S. 49, 61 [95 S.Ct. 2069, 2077, 45 L.Ed.2d 12] (1975); *Sampson v. Murray,* 415 U.S. 61, 88 [94 S.Ct. 937, 951, 39 L.Ed.2d 166] (1974); *Beacon Theatres, Inc. v. Westover,* 359 U.S. 500, 506–507 [79 S.Ct. 948, 954–55, 3 L.Ed.2d 988] (1959); *Hecht Co. v. Bowles,* [321 U.S. 321,] 329 [64 S.Ct. 587, 591, 88 L.Ed. 754 (1944)]."

*Weinberger v. Romero–Barcelo,* 456 U.S. 305, 311–12, 102 S.Ct. 1798, 1803, 72 L.Ed.2d 91 (1982). By that standard, no injunction is warranted here. Love has not explained what an injunction could accomplish at this stage of the litigation beyond a gratuitous slap at Kwitny. As noted above, "Endless Enemies" does not appear now to be a hot item, and the book is available in libraries for those still curious to read it. Love himself seems to have acknowledged the obvious by waiving any claim for his own lost profits: if there ever were any such profits, they are gone and cannot be proved. In that circumstance, it is both impossible to conceive of a future market for Love's paper that would be protected by an injunction and impermissible to hallucinate one. When the injurious consequences to Love's copyright from continued circulation of Kwitny's book are, if anything, " 'trifling,' " *id.* at 312, 102 S.Ct. at 1803, no injunction is warranted whether or not laches or estoppel has been proved. Accordingly, none will issue.

II.

Plaintiff's motion for Rule 11 sanctions is supported, if that is the word, by some 87 pages of argument, of which the vast majority is given over to criticism of defendants' successful summary judgment motion which resulted in Judge Owen's dismissal of the libel claim. Indeed, it appears from a comparison of plaintiff's current briefs with the one he submitted to Judge Owen that for the most part he has simply taken the unsuccessful arguments he submitted to Judge Owen, reheated them to a rolling boil, and served them up as a Rule 11 motion.

This opinion would be prolonged unduly and the rights of other and more worthy litigants sacrificed inexcusably if I were to respond to each of plaintiff's claims. It is useful, however, to examine one that captures the spirit and betrays the emptiness of plaintiff's submission. Plaintiff asserts that one paragraph of defendants' statement of uncontested facts submitted to Judge Owen pursuant to Rule 3(g) of this court's Civil Rules embodied "an act of dishonesty quite possibly unparalleled in the history of Federal-court litigation." (Mem. in Support of Plaintiff's Motion p. 8) This "ultimate act of dishonesty," we are told, "may well have been immensely damaging to plaintiff in the summary judgment proceeding...." (*Id.* at p. 11)

The paragraph in question concerned the content of a *New York Times* story published in September 1980 which reported on

a magazine article purporting to expose plaintiff as a CIA agent for his alleged role in the coup that overthrew the Mossadegh government, and plaintiff's response to that magazine article. According to the *Times*, Love attributed his failure to report on American involvement in the coup, "once he learned of it later in 1953," to "misguided patriotism." The offending paragraph in the Rule 3(g) statement said, in part: "Love is quoted in the article as stating that his involvement in the Iranian coup was a result of 'misguided patriotism.'"

When plaintiff objected to that paragraph, defendants amended it as follows:

"With respect to the third sentence of Statement No. 24, the September 26 *New York Times* article states: 'He said his failure to report on American involvement in the coup, once he learned about it later in 1953, was a result of "misguided patriotism."'

(DX 17)

To the extent that the September 26 article uses the language 'his failure to report American involvement in the coup,' moving defendants hereby amend the third sentence of their Statement No. 24 to read accordingly. As amended, there can be no genuine dispute as to the facts set forth in the third sentence of Statement No. 24." (Lankenau Aff. Exh. P, p. 8)

Moreover, Judge Owen's enviably succinct opinion made it clear that he was under no misimpression as to the content of the *Times* story. He noted that it, "quoted Love as saying that 'his failure to report on American involvement in the coup ... was a result of "misguided patriotism."'" 1987 WL 5799, slip op. at 4.

Notwithstanding that the initial misstatement in defendants' Rule 3(g) statement was corrected, and that the misstatement obviously had no effect whatever on the result, plaintiff's Rule 11 motion papers do not disclose the correction, and suggest that the ellipses in Judge Owen's opinion constitute evidence that the judge "doctored" the record (Memorandum in Reply, p. 4), notwithstanding that all those ellipses

signal is the omission of Love's self-serving and dubious suggestion that he was unaware of American involvement in the coup at a time when, according to his unpublished paper, he was witnessing that involvement. 706 F.Supp. at 1125. Although plaintiff now takes the position that the narrative in that paper must be read as describing not only what plaintiff witnessed during the events of August 1953 but also what he learned in the weeks and months thereafter, there was no reason based on the paper itself for Kwitny to have taken that position in his book and therefore no reason for Judge Owen to have taken it in his opinion.

Plaintiff justifies as follows his overwrought characterization of defendants' conduct with respect to the Rule 3(g) statement:

"If one peruses the Rule 11 cases that have been decided in the past few years, one finds that almost all of them have to do with frivolous claims or pleadings. The undersigned was unable to find a single case in which a party had tampered with trial testimony or massively engaged in forwarding to the Court statements that were either factually false or for the assertion of which good grounds were lacking. Surely, if such a case existed, someone would have been tempted to ask for Rule 11 sanctions to be imposed. We therefore regard our earlier statement, that the manufactured confession constitutes 'an act of dishonesty quite possibly unparalleled in the history of Federal-court litigation', moving Memorandum, at 8, one that, of course, is not refuted in the opposing papers by any counterexample, as further substantiated by our researches." (*Id.* at p. 11)

Plaintiff was no more restrained in the relatively few pages of his memoranda discussing conduct relating to the copyright claim. Once again, one example will suffice. Plaintiff has taxed defense counsel with seeking to elicit testimony from experts to the effect that the particular narrative in Love's paper had value, apart from the facts it conveyed, as the words of

a participant in significant events. This, plaintiff argues, was part of a dishonest stratagem to portray Love as a participant in the coup rather than as merely a witness, and thereby to elicit a ruling that might help in the defense of another of the libel actions Love has brought in connection with publication of "Endless Enemies," a stratagem wholly unrelated to the copyright case. (Memorandum in Support of Plaintiff's Motion pp. 28–32) This, we are told, was "fully on par" (Memorandum in Support of Plaintiff's Motion, pp. 31–32) with the (otherwise) "unparalleled" conduct discussed above.

Yet defense counsel's theory of a relationship between the testimony sought to be elicited and the copyright case was apparent, even if I did not subscribe to the theory and still do not. What defense counsel apparently tried to establish was some apparent necessity, or at least justification, for using Love's own words rather than merely the facts they conveyed, and thereby arguing that such use was "fair" within the meaning of the fair use doctrine. The attempt failed, but that is a far cry from saying it violated Rule 11. Moreover, even if defendants were seeking simply for the sake of another libel action to portray Love as a participant in the events he wrote about in his paper rather than as a mere spectator, they could hardly have done better than Love's own words in his paper, where he wrote as follows of his encounter with royalist tanks at the radio station: "Incidentally, I, myself, was responsible, in an impromptu sort of way, for speeding the final victory of the royalists." (PX 5A, p. 39)

This example illustrates two things. The first is that as between the parties, and particularly to plaintiff, the libel claim is the heart of the dispute; the copyright case was a sideshow. Plaintiff's focus at trial and now is on the libel claim. *See* 706 F.Supp. at 1130 (describing Love's testimony about his confrontation with Kwitny at the Downtown Athletic Club). The second is that plaintiff has condemned as a Rule 11 violation any suggested view or interpretation of the facts that differs from his own. Which is to say, what he objects to is advocacy by his opponent. Yet advocacy, even accompanied by occasional mistakes, is precisely what courts must be careful to protect even as they apply Rule 11. *Eastway Constr. Corp. v. City of New York*, 762 F.2d 243, 254 (2d Cir.1985), *cert. denied*, 484 U.S. 918, 108 S.Ct. 269, 98 L.Ed.2d 226 (1987).

Defendants have not formally cross-moved for Rule 11 sanctions, although they have pointed out that Rule 11 applies just as logically to a Rule 11 motion as it does to any other submission, *Nakash v. United States Dep't. of Justice*, 708 F.Supp. 1354, 1368 (S.D.N.Y.1988), that the Rule permits a court to act *sua sponte*, and that I have so acted in the past. *Refac Int'l. Ltd. v. Lotus Development Corp.*, 1991 WL 50278 (S.D.N.Y.1991). Defendants' counsel avers that he spent at least a week's time responding to the motion.

The implied invitation to act *mea sponte* is accepted only to the extent of a finding that plaintiff obviously has violated the Rule by filing a motion in which no reasonable lawyer could have found objective merit. Rather, the motion appears to have been crafted to serve two purposes extrinsic to the Rule: (i) to litigate for a third time the merits of the libel motion on the off chance that Judge Owen's initial decision and his denial of reargument somehow could be undermined in aid of appeal, and (ii) to try to recover fees after a prior ruling in this case made it clear that no fees could be awarded under the Copyright Act, 1989 WL 140578, and after damage submissions made it equally clear that plaintiff's recovery would not be substantial.

However, no financial relief will be granted to compensate defendants for the time spent answering plaintiff's motion, principally because the motion is not only in substantial part a reheated version of plaintiff's position on defendants' summary judgment motion which defendants had already responded to, as set forth above, but is also probably a foretaste of plaintiff's position on appeal. Defendants' work product thus duplicates prior effort to a

certain extent; and even to the extent it does not it probably will not have been wasted. This denial of attorney's fees is not a matter of no harm, no foul; rather, no harm, no foul deserving of any greater penalty than a finding that a foul has been committed.

\* \* \* \* \* \*

For the above reasons, plaintiff will recover of each of defendants the sums specified on the first page of this opinion, but will be granted no other relief.

SO ORDERED.