Stuart Y. SILVERSTEIN,
Plaintiff–Appellee,

v.

PENGUIN PUTNAM, INC.,
Defendant–Appellant.

No. 03–7363.

United States Court of Appeals,
Second Circuit.

Argued: Jan. 8, 2004.

Decided: May 7, 2004.

Richard Dannay, Cowan, Liebowitz & Latman, New York, NY (Thomas Kjellberg, on the brief), for Appellant.

Mark A. Rabinowitz, Neal, Gerber & Eisenberg LLP, Chicago, IL (Michael A. Carrillo, on the brief), for Appellee.

Before: WINTER, JACOBS, and STRAUB, Circuit Judges.

JACOBS, Circuit Judge.

In 1996, Stuart Y. Silverstein published a book of Dorothy Parker poems that had not been collected in the three volumes of poetry she published in her lifetime, and that Silverstein had mined chiefly from old magazines and newspapers. Silverstein claims copyright in the selection and arrangement of those poems. (The owner of Mrs. Parker's copyright is not involved in this litigation.) Penguin Putnam, Inc. ("Penguin") was offered the opportunity to publish Silverstein's volume in 1994, but declined. In 1999, Penguin issued *Dorothy Parker: Complete Poems* ("*Complete Poems*"), which is composed of the three volumes published by Mrs. Parker plus all but one of the uncollected poems in Silverstein's book, which are chronologically arranged at the back.

Silverstein asserts claims against Penguin for copyright infringement, violation of the Lanham Act, immoral trade practices and unfair competition, and for an injunction. After a hearing, the United States District Court for the Southern District of New York (Keenan, *J.*) granted summary judgment in favor of Silverstein as to copyright, Lanham Act, and immoral trade practices and unfair competition, and it enjoined Penguin from selling or further distributing *Complete Poems*. *See Silverstein v. Penguin Putnam, Inc.*, No. 01 Civ. 309, 2003 WL 1797848, 2003 U.S. Dist. LEXIS 5487 (S.D.N.Y. Apr. 4, 2003). On March 9, 2004, we vacated the injunction and announced that an opinion would follow.

We conclude that there are material issues of fact as to whether Penguin has taken any creative input by Silverstein that is more than trivial, and we remand for further proceedings. We hold that, in any event, the right asserted by Silverstein is too slight to support an injunction against publication of the Penguin volume: Silverstein holds no copyright in the poems themselves; Penguin has not used Silverstein's arrangement; and the chief principle of Silverstein's selection—that the poems previously had not been collected—reflects an exercise of judgment by Mrs. Parker, not by Silverstein.

Silverstein undertakes to demonstrate a protectible right in the selection by showing that he excluded from his compilation some of the uncollected poems, either be-

cause he did not consider them to be "poems" or because he believed they had not been written by Mrs. Parker. There are, however, questions of fact that bear on whether Silverstein is entitled to any protection for his selection of uncollected poems or whether in fact he simply published as many as he could find.

## BACKGROUND

Dorothy Parker, a prolific American poet, short-story writer, screenwriter, and critic, published three volumes of poetry in her lifetime: *Enough Rope* (1926), *Sunset Gun* (1928), and *Death and Taxes* (1931). They have been continuously in print since 1944 within *The Portable Dorothy Parker*.[1]

Silverstein undertook to compile the poems that Mrs. Parker had omitted from her collections. After more than a year combing back issues of periodicals, including *Vanity Fair*, *The New Yorker*, and *Life*, Silverstein identified 122 uncollected poems. Most are from magazines, some are from newspapers, and two had never been published. He published them in 1996, in a book entitled *Not Much Fun: The Lost Poems of Dorothy Parker* ("*Not Much Fun*").

In 1994, prior to the publication of *Not Much Fun*, Silverstein submitted his manuscript to Penguin for consideration. Each page of the manuscript carried the notation: "Compilation ©1994 Stuart Y. Silverstein. All rights reserved." Penguin offered Silverstein $2,000 for the right to publish his compilation as part of a larger volume of Mrs. Parker's work that would include all of her collected and uncollected poems. Silverstein preferred publication in a separate volume.

In 1999, Penguin published *Dorothy Parker: Complete Poems*. This compilation re-published her three existing collections and added at the end a section called "Poems Uncollected by Parker." The end section contained 121 of the 122 poems printed in Silverstein's book,[2] ordered chronologically rather than in Silverstein's more subjective arrangement. However, Penguin concedes that the editor who prepared that section photocopied *Not Much Fun*, cut the poems apart with scissors, and pasted them into the Penguin manuscript chronologically. *Complete Poems* does not reference or acknowledge Silverstein or *Not Much Fun*.

Silverstein brought suit in the United States District Court for the Southern District of New York in 2001, alleging that Penguin (i) infringed his copyright under the Copyright Act of 1976, 17 U.S.C. § 101 *et seq.*; (ii) engaged in "reverse passing off" in violation of section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); and (iii) engaged in immoral trade practices and unfair competition in violation of New York law. Judge Keenan granted Silverstein's motion for summary judgment and permanently enjoined Penguin from further sales or distribution of *Complete Poems*. The court found that *Not Much Fun* was entitled to copyright protection because Silverstein's selection of the poems evinced the level of creativity needed to render it an original work of authorship. He focused on the subjective judgment used by Silverstein in selecting and characterizing the chosen works as poems, "relying on his own taste, judgment, and informed decision-making." *Silverstein*, 2003 WL 1797848, at *4, 2003 U.S. Dist. LEXIS 5487, at *12. The court found that

---

1. Mrs. Parker added one previously uncollected poem to *The Portable Dorothy Parker:* "War Song."

2. The poem "Day–Dreams," which Silverstein included in *Not Much Fun,* had been collected by Mrs. Parker in *Enough Rope* and was published that way in *Complete Poems*.

Penguin infringed Silverstein's copyright by copying and pasting his protected selection into *Complete Poems*. *Id.* at *6–*7, 2003 U.S. Dist. LEXIS 5487, at *18–*21.

The district court also granted summary judgment for Silverstein on the Lanham Act claim, finding that Penguin's failure to credit Silverstein in *Complete Poems* was a willful false designation. *Id.* at *7–*8, 2003 U.S. Dist. LEXIS 5487, at *22–*24. Finally, the court found that Silverstein's state law claims were not preempted by federal copyright law, and it granted summary judgment for him on those claims as well. *Id.* at *8, 2003 U.S. Dist. LEXIS 5487, at *25.

The district court denied Penguin's motion for a stay of the injunction pending appeal, finding insufficient likelihood of success on the merits on appeal and no evidence that Penguin would suffer irreparable injury absent a stay. On June 11, 2003, the district court entered a permanent injunction barring Penguin from publishing or selling *Complete Poems*, and requiring a full recall of all existing copies.

This Court heard oral argument in the appeal on January 8, 2004. On March 9, 2004, we vacated the injunction, but warned that vacatur did not signify that judgment would be entered in Penguin's favor, or that Silverstein may not be entitled to recover damages (pursuant to 17 U.S.C. § 504(c)) or costs and attorneys' fees (pursuant to 17 U.S.C. § 505), the amount of which could be affected by Penguin's resumed distribution of *Complete Poems*.

## DISCUSSION

### I

■ This Court reviews the district court's grant of summary judgment *de novo*. *See Young v. County of Fulton*, 160 F.3d 899, 902 (2d Cir.1998). In doing so, we are required to view the evidence in the light most favorable to the non-moving party and to draw all reasonable inferences in its favor. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Maguire v. Citicorp Retail Servs., Inc.*, 147 F.3d 232, 235 (2d Cir.1998). Summary judgment is appropriate only where "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

■ It is well settled that compilations of fact may be copyrightable even though facts themselves are not protected. 17 U.S.C. §§ 102, 103 (2003); *Feist Publ'ns v. Rural Tel. Serv. Co.*, 499 U.S. 340, 344, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991). Because "the *sine qua non* of copyright is originality," a compilation must possess "at least some minimal degree of creativity" to warrant copyright protection. *Id.* at 346, 111 S.Ct. 1282.

■ Mrs. Parker herself created the category of uncollected Parker poems by collecting fewer than all her poems in her lifetime; so that principle of selection owes nothing to Silverstein. Silverstein claims as his creative contribution the weeding out of works that he did not consider to be poems and of works he believed Mrs. Parker did not write. He undertakes to demonstrate his selectivity by identifying (A) differences in classification between *Not Much Fun* and bibliographies prepared by a Parker biographer; and (B) additions and omissions made to Silverstein's manuscript between the time it was offered to Penguin and the time it was published. Silverstein further claims that his copyediting changes reflect subjective judgment.

### A.

Silverstein claims that he and Professor Randall Calhoun—a foremost Parker

scholar and bibliographer—disagree as to whether certain uncollected Parker works should be considered poems. In particular, Silverstein cites six works that he labeled as poems or verses and included in *Not Much Fun,* but that do not appear on the list of poems published in Calhoun's "bio-bibliography" of Mrs. Parker.[3]

Silverstein claims that he classified six items as poems that Calhoun "concluded" were not. However, Professor Calhoun does not seem to be a party to this scholarly dispute. Silverstein has never communicated with Calhoun and has no direct knowledge of what, if anything, he "concluded." Moreover, Calhoun undertakes to list only poems that were published in certain specified periodicals, and he acknowledges that the list may be incomplete even as to those periodicals: "the primary bibliography is as complete as I could make it, given the limitation of time."

As to the six allegedly disputed poems, two of them—"The Passionate Screenwriter to His Love" and "Letter to Robert Benchley"—were, according to Silverstein, never before published; so there is no basis for assuming that Calhoun was aware of them, or that he would have omitted those works if he was.

Little judgment inheres in Silverstein's classification of "Monody" and "Men I'm Not Married To" as (i) poems (ii) written by Mrs. Parker. Both were published as poems, in metered lines and stanzas. "Monody" was signed by Mrs. Parker; "Men I'm Not Married To" was signed by Helen Wells (a near-homophone of "hell on wheels"), a well-known Parker pseudonym. Calhoun's omission of these items does not

remotely suggest a scholarly conclusion that they are not poems written by Dorothy Parker.[4]

"Chris–Cross" and "After Dawn" are verses that were published within book reviews that are listed in the "Book Review" section of Calhoun's bibliography. This classification is not indicative of whether he considered the embedded verses to be "poems." Calhoun did not double-count any items published by Mrs. Parker within his bibliography; each work that he found appeared in one section only. Thus, Calhoun may have pegged "Book Reviews" as the best overall category for these works, whether or not he recognized the embedded verses as poems.

As further evidence of his exercise of judgment and disagreement with Calhoun, Silverstein cites seven works listed as poems in Calhoun's bibliography that Silverstein omitted from *Not Much Fun.* Six of them are classified by Calhoun as one work—"Standardized Song Sheet for Get–Together Meetings"—appearing on a single page in *Life.* The "Song Sheet" is a set of six famous songs to which Mrs. Parker provided alternative words ("Marching Through Georgia"; "A Long, Long Trail"; "Dear Old Pal of Mine"; "Tipperary"; "K–k–k–Katy"; and "Auld Lang Syne"). It is possible that Silverstein omitted the "Song Sheet" because he considered it pastiche or parody rather than Mrs. Parker's own verses. On the other hand, there is a question as to whether Silverstein was aware of the existence of the "Song Sheet" (or of the remaining poem listed by Calhoun) before publication of *Not Much Fun.*

---

3.  The six works included in *Not Much Fun* are: "The Passionate Screen Writer to His Love"; "Letter to Robert Benchley"; "Monody"; "Men I'm Not Married To"; "Chris–Cross"; and "After Dawn."

4.  Calhoun's bibliography also overlooks a number of collected Parker poems that had appeared in the magazines he searched, including "Epitaph"; "Hearthside"; "Pour Prendre Congé"; "The Sea"; and "Autumn Valentine."

Silverstein has no high regard for the accuracy and reliability of Calhoun's work. He only discovered Calhoun's book "about midway through" his research, and stated that he "used it after I went through and found all the poems myself[;] I went through it to find out if I missed anything." Silverstein culled "two or three items" from Calhoun's book that he had not discovered on his own, all of which had been published in the *Saturday Evening Post* under one of Mrs. Parker's pseudonyms. He also used the book to locate one uncollected poem called "Balto." But Silverstein seems not to have carefully cross-checked the "Complete Chronology" section of *Not Much Fun* against Calhoun's bibliography. Silverstein lists at the end of his chronology the poems for which he could not find the original publication date; yet Calhoun's bibliography listed original publication dates for at least three of those poems ("The Dramatists"; "Ballade of a Well–Earned Weariness"; and "The False Friends"). Silverstein also omitted from his "Complete Chronology" one previously-collected poem that Calhoun had listed in his bibliography complete with source and publication date ("To a Lady Who Must Write Verse," *The New Yorker*, June 18, 1928).

In short, the inclusion of two (or seven) poems in Calhoun's bibliography does not establish that Silverstein's omission of them reflects a dispute on classification between scholars, or that Silverstein actually knew that the poems he omitted even existed. If Silverstein did not find these poems before submitting the *Not Much Fun* manuscript, there could be no creativity in their exclusion. Moreover, even if Silverstein knowingly omitted these poems, a question still remains as to whether that decision (alone or together with others) imbued his selection with sufficient creativity to warrant copyright protection.

## B.

As further evidence of his creativity in selection, Silverstein points to twenty-five poems in the final manuscript of *Not Much Fun* that were added after his 1994 submission to Penguin. However, there is no evidence as to when Silverstein discovered those twenty-five items, or when (or why) he decided to exclude (or add) them. For example, there seems to be no evident reason Silverstein would withhold recognition of "Rosemary [1]" as a poem by Mrs. Parker; it is in iambic pentameter, in two stanzas each composed of two rhyming quatrains, and it appeared originally in the *Saturday Evening Post* under Mrs. Parker's Helen Wells pseudonym. Silverstein stated in his deposition that he had not flagged any works written under Mrs. Parker's pseudonyms before he saw them listed in Calhoun's book; it is therefore possible that he found "Rosemary [1]" and other pseudonymous poems after much of his research had been completed.

Most of the twenty-five "initially excluded" poems appear originally to have been published as poetry, in metered lines arranged in rhymed stanzas. It is unexplained why Silverstein would have deliberately excluded them if he had discovered them prior to 1994; and if Silverstein did not find all or most of these twenty-five poems until after he had submitted the manuscript to Penguin, he would be hard pressed to argue that their subsequent inclusion reflects creative judgment. In any event, there are issues of fact as to the timing of Silverstein's discovery of these poems, and whether his decision to ultimately include them in *Not Much Fun* reflects creative judgment.

Silverstein also cites as evidence of creative selection his ultimate exclusion of four works that had initially been included in

the manuscript of *Not Much Fun.* In the 1994 manuscript, the table of contents was divided into two categories, poems and verse, and the four works in question were set apart and listed together approximately four lines below the end of the "verse" category. The removal of these works may reflect a creative judgment that the works are not poems. Calhoun's bibliography categorized the works, called "Figures in American Folk Lore," as prose. There are questions as to whether these items were excluded because Silverstein decided they were prose, or for some other reason; if so, whether their classification as prose entailed creativity; and if so, whether that example of creativity (alone or with others) fuels a spark sufficient to sustain copyright.

## C.

■ Silverstein claims to have made 600 copy edits, mainly changes in punctuation, capitalization, indentation, and titling, in order to standardize the text. The district court did not conclude that these emendations were entitled to copyright protection, and Silverstein reasserts infringement of these aspects on appeal.

There is a question as to whether copyediting changes of this kind are sufficiently creative to merit copyright protection. *See Matthew Bender & Co. v. West Publishing Co.,* 158 F.3d 674, 681 n. 4 (2d Cir.1998) (noting that corrections to the text, including punctuation or spelling, may be trivial); *Torah Soft Ltd. v. Drosnin,* 136 F.Supp.2d 276, 287 (S.D.N.Y.2001) (Scheindlin, *J.*) (holding that "functional, as opposed to creative, alteration[s]" are not protectible). Moreover, even assuming these changes were protectible, Silverstein is estopped from asserting infringement on this basis. *Not Much Fun* contains no "Note on the Text" or other advice to the reader that changes were made in punctuation, titling, or formatting, let alone what those changes were. The introduction and dust jacket both imply that the works appear as originally published by Mrs. Parker. A reasonable reader would conclude that Silverstein was reproducing Mrs. Parker's own work. Silverstein cannot now claim that Penguin infringed his selection by copying textual alterations of which he gave no notice. *See Arica Inst., Inc. v. Palmer,* 970 F.2d 1067 (2d Cir.1992) (plaintiff estopped from arguing that copyrighted work is creative if work represented as completely factual).

## D.

A compiler of material previously published by others certainly may enjoy a copyright in the selection if "some minimal level" of creativity has been exercised in the selection process. *See Feist,* 499 U.S. at 348, 358–59, 111 S.Ct. 1282. And if the selection process imbues a compilation with the requisite creative spark, the compilation may be protected so long as there are indicia that principles of selection (other than all-inclusiveness) have been employed. *See Matthew Bender & Co.,* 158 F.3d at 687 (finding West's decision to include every record of Supreme Court opinions in a database constituted "no 'selection' at all" for copyright purposes). As discussed, material questions of fact exist as to whether Silverstein exercised creativity in selecting the works for his compilation. Those questions must be answered before the creativity, if any, in his selection process can be assessed. We therefore reverse the grant of summary judgment on the copyright claim and remand for further findings, which in turn will determine whether monetary relief is warranted.

## II

■ The grant of a permanent injunction is reviewed for abuse of discretion.

*S.C. Johnson & Son, Inc. v. Clorox Co.,* 241 F.3d 232, 237 (2d Cir.2001). The Copyright Act provides that "[a]ny court having jurisdiction of a civil action arising under this title may ... grant temporary and final injunctions on such terms as it may deem reasonable to prevent or restrain infringement of a copyright." 17 U.S.C. § 502(a). The power is equitable in nature. *See New Era Publ'ns Int'l, ApS v. Henry Holt & Co.,* 873 F.2d 576, 584 (2d Cir.1989); *Am. Metro. Enters., Inc. v. Warner Bros. Records Inc.,* 389 F.2d 903, 904–05 (2d Cir.1968).

■■■ The grant of injunctive relief is an extraordinary remedy. *See Fishman v. Schaffer,* 429 U.S. 1325, 1325–26, 97 S.Ct. 14, 50 L.Ed.2d 56 (1976); *Rizzo v. Goode,* 423 U.S. 362, 378, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976); *Hanson Trust PLC v. SCM Corp.,* 774 F.2d 47, 60 (2d Cir.1985). In the copyright realm, it has been said that an injunction should be granted if denial would amount to a forced license to use the creative work of another. *See, e.g., Nat'l Football League v. Primetime 24 Joint Venture,* No. 98 Civ. 3778, 1999 WL 760130, at *4, 1999 U.S. Dist. LEXIS 15261, at *12 (S.D.N.Y. Sept. 27, 1999) (where copyright in telecast of football games was infringed by re-transmission of the games, "the failure to issue a final injunction" would "be tantamount to the creation of a compulsory license, future damages then becoming a sort of royalty"); *Paramount Pictures Corp. v. Carol Publ'g Group,* 11 F.Supp.2d 329, 338 (S.D.N.Y. 1998) (where infringing publication recapitulated the copyrighted fictitious history of "Star Trek," denial of injunction would render the "copyright holder an involuntary licensor of the copyright to any entity that could be relied on to pay damages"). In many instances, injunctive relief may be the best or only way to preserve the exclusivity of a copyright.

■■■ But injunctive relief to enforce a copyright is not compelled. *E.g., Dun v. Lumbermen's Credit Ass'n,* 209 U.S. 20, 23–24, 28 S.Ct. 335, 52 L.Ed. 663 (1908) (injunction "unconscionable" where degree of infringement is slight compared to the injury that would result from injunction); *Love v. Kwitny,* 772 F.Supp. 1367, 1375 (S.D.N.Y.1991) ("When the injurious consequences to [holder's] copyright from continued circulation of [infringing] book are, if anything, 'trifling,' no injunction is warranted."); *Abend v. MCA, Inc.,* 863 F.2d 1465, 1479 (9th Cir.1988) (awarding monetary rather than injunctive relief, despite copyright infringement, where plaintiff "has not shown irreparable injury which would justify imposing the severe remedy of an injunction on defendants"); *see also Boisson v. Banian Ltd.,* 280 F.Supp.2d 10 (E.D.N.Y.2003) (injunction unnecessary to remedy infringement where threat of future infringing activity is low); 4 Nimmer on Copyright § 14.06 ("where great public injury would be worked by an injunction ... the courts could ... award damages or a continuing royalty instead of an injunction"). We conclude, for the following reasons, that any protectible interest Silverstein may have would be so slight that it cannot properly be enforced by a preliminary or permanent injunction.

First, an injunction issued to protect any creative spark contributed by Silverstein will impact the value of the copyright in the poems themselves, which subsists in other hands. Second, *Complete Poems* does not appropriate Silverstein's arrangement; the only copyright claimed by Silverstein that Penguin arguably infringed is in the selection. As to that, the chief principle of selection is that the poems collected by Silverstein were *not* collected by Mrs. Parker in her lifetime. The selection was thus made by Mrs. Parker, and it remained for Silverstein only to gather up

the poems she selected for exclusion. Third, the gathering itself was work of a kind that copyright does not protect. *See Feist,* 499 U.S. at 347, 111 S.Ct. 1282.

Moreover, the principle of selection adopted by Penguin—completeness—owes little or nothing to Silverstein. The assembly of a complete collection may entail judgments as to variants, attributions, juvenilia, etc. But Penguin evidently did nothing other than publish all the poems it could find in print. To the extent Silverstein's compilation was a selection by him from some larger body of poems, or a creative designation of a work as poetry that might otherwise be deemed something else, Silverstein gave no notice or warning. The only principle of selection he identified was completeness, insofar as his diligent labor could achieve it. But "all" is not a selection. *See Matthew Bender & Co.,* 158 F.3d at 687.

The clear impression conveyed by *Not Much Fun* is that there was no other principle of selection at work. Silverstein included at the end of *Not Much Fun* a bibliography of poems called "The Complete Chronology"; Silverstein describes it as "a chronological list of *all* of Dorothy Parker's poems and verses." In it, Silverstein lists (chiefly by date) all the poems published during Mrs. Parker's lifetime, all the poems published in *Not Much Fun,* and no others.[5] Thus anyone wishing to compile a complete collection of the poems could conclude that Silverstein's selection of "all" was unprotected, or at most that

his selection was guided by some criteria that are not indicated.

Penguin may have had more or better information about Silverstein's contribution based on its receipt of the early manuscript and its negotiations with Silverstein; but an injunction should not be employed to bar Penguin from doing what any other publisher assembling a complete works could do. Even if Silverstein's creative contribution to the selection of Mrs. Parker's previously uncollected poems is nontrivial, and even if Penguin's appropriation of it was deliberate, enforcement of his rights by a preliminary or permanent injunction that stops publication of *Complete Poems* is an abuse of discretion.

### III

In the re-opened proceedings, the district court may make findings and rulings that bear upon the remaining causes of action or that obviate some of the questions presented. We therefore decline to review the grant of summary judgment on the remaining claims except to remand for further proceedings consistent with this opinion. *See Scottish Air Int'l, Inc. v. British Caledonian Group, PLC,* 945 F.2d 53, 55 (2d Cir.1991).

Although resolution of the copyright issue is not dispositive of the Lanham Act charge, the resolution of open issues of fact (as to the extent of Silverstein's creative input) may bear on the Lanham Act claim.[6] The state law claims for unfair

---

5. The "Complete Chronology" is followed by an anecdote in which Lord Melbourne gloats on the death of a poet, "I am always glad when one of these fellows dies, for then I know I have the whole of him on my shelf." The anecdote explicitly reinforces the idea that Silverstein's principle of selection is completeness.

6. Lanham Act claims are "separate and distinct" from those brought under the Copy-

right Act, *see Waldman Publ'g Corp. v. Landoll, Inc.,* 43 F.3d 775, 781 (2d Cir.1994); but elements of a copyright infringement inquiry may guide the analysis of a Lanham Act claim for "reverse passing off." In determining whether the work at issue originated with the plaintiff (an element of the claim), we have often turned to copyright law: "[i]t is fair to say that it would constitute a false designation of origin to publish without attribution to its

competition and immoral trade practices likewise may turn on the resolution of the outstanding questions of fact. Finally, vacatur of the injunction may well affect the nature and amount (if any) of damages that may be awarded for claims on which Silverstein may prevail.

## CONCLUSION

For the foregoing reasons, we hold that Silverstein's rights are limited to his selection or categorization of some works as "poems" that were written by Mrs. Parker. Whether and to what extent he holds such rights depends upon the degree to which his efforts involved the requisite creativity and were, viewing his collection as a whole, more than *de minimis*. We therefore vacate the permanent injunction, reverse the district court's grant of summary judgment on the copyright claim, and remand for further proceedings.

author a work that is original enough to deserve copyright protection." *Id.* at 782.